Wilbert **ESSEX**, Plaintiff–Appellant,

v.

**UNITED PARCEL SERVICE, INC.,** Defendant–Appellee.

No. 96–2756.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1997.

Decided April 17, 1997.

Angela Marotto, Christopher Timmons (argued), Valparaiso University Law Clinic, Valparaiso, IN, Lewis H. Griffin, Fort Wayne, IN, for Plaintiff-Appellant.

Daniel C. Emerson (argued), Steven G. Rudolf, Bose, McKinney & Evans, Indianapolis, IN, for Defendant-Appellee.

Before ESCHBACH, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

ESCHBACH, Circuit Judge.

In February 1993, United Parcel Service, Inc. ("UPS") fired Wilbert Essex from his job as a package car driver. Essex claims that the real reason behind this discharge was either race discrimination or retaliation for previous claims he had filed. Thus, he brought the instant suit alleging that UPS violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The district court granted summary judgment to UPS on both claims and Essex appealed. For the reasons set forth below, we affirm.

## I. Background

Wilbert Essex, hired as a part-time loader in 1969, was one of the first African-American employees at UPS's Fort Wayne South center. In 1983, UPS hired Essex as a full-time package car delivery person. In this capacity, Essex drove one of those brown UPS trucks and made deliveries and pick-ups in the Fort Wayne area. The distinguishing feature of Essex's time with UPS has been the number of complaints and union grievances[1] he filed while employed there. During his last year at UPS alone, Essex filed over 400 grievances. In 1992, Essex grieved the imposition of a three-day suspension for not meeting performance standards. During the arbitration of this grievance, Essex stated that he worked approximately 32 to 40 hours at a second job as a bail commissioner with Allen County. This statement sparked a chain of events leading eventually to the appeal now before this court.

Department of Transportation ("DOT") regulations limit the amount of "on-duty" time certain drivers can work to 60 hours per week. 49 C.F.R. § 395.3(b)(1). On-duty time includes work at any job, even if some of that work is not for a motor carrier. 49 C.F.R. § 395.2.[2] In light of these regulations, the news that Essex moonlighted 32 to 40 additional hours at a second job set off alarm bells in UPS's proverbial mind. According to UPS, this was the first time it had ever become aware of an employee who worked so many outside hours that it resulted in excessive on-duty time. Thus, in a letter dated January 6, 1993 (the "January 6 letter"), UPS requested that Essex verify the number of hours he worked outside UPS. On January 7, 1993, UPS met with Essex to discuss the request. When Essex arrived at work the next day without verification of his

---

1. The International Brotherhood of Teamsters, Local 710, represents UPS package car drivers for purposes of collective bargaining.

2. Essex disputed in the district court that he is covered by the DOT regulations because he drives only intrastate, but he does not press this argument on appeal.

outside hours, UPS suspended him. On January 11, Essex gave his supervisors a letter requesting 30 days to consult with his attorneys and research the request. The letter also stated that Essex would, in the meantime, request the information from his second employer. UPS granted Essex's request for a 30 day extension provided that he orally report his hours during that time. UPS claims that Essex did not honestly report his hours, making independent verification that much more important. Essex orally reported only 54 outside hours during the next 30 days, but UPS obtained payroll records which revealed that Essex was paid for 120 hours between January 7 and January 31. At the end of the 30 day extension, on February 10, UPS again sought independent verification of Essex's hours. When Essex still did not produce verification of his outside hours after five days, UPS suspended him. As a result, Essex was suspended on February 17, 18, 19, and 22. In a letter dated February 18, 1993, Essex asked John Higgins, the UPS District Labor Manager for the Indiana District, for a letter he could give to his second employer regarding the hours verification. Essex had previously made this request to other supervisors and was told, as he was again by Higgins, that he should show his second employer a copy of the January 6 letter. In a warning letter dated February 22, 1993, but issued the next day, UPS also informed Essex that he must provide the requested verification within 72 hours or be discharged. Essex still did not produce the requested documentation of his hours. On March 1, 1993, over a month and a half after its original request, UPS notified Essex that on February 26 he was discharged for insubordination because he had failed to provide the requested verification of the hours he worked outside of UPS.

Essex paints a different picture of the events surrounding his discharge. According to Essex, the verification requirement was just the last example of a long series of acts of discrimination and harassment against him by UPS. It is undisputed that UPS has never required another employee to obtain written verification of her outside on-duty hours. Essex asks the question, "why me?" and answers that it must be because UPS wanted him out, either because he is African American or because UPS wanted to retaliate for the many grievances and complaints he had filed in the past. Essex does not dispute that he failed to comply with the UPS request to provide independent verification of his hours. Rather, he claims his discharge was discriminatory because it was based on disobedience to a discriminatory request. UPS had no policy of requesting such verifications and did not request verification from any other employee, even though it knew other employees worked outside jobs. Essex argues that, although UPS may not have known of others' exact hours, it knew that there was a danger that the outside employment of other employees jeopardized compliance with DOT regulations. Because the DOT limit is only 60 hours per week, even a part-time job in addition to full-time work at UPS could violate these regulations. Yet UPS did not require any other employee to report her hours.

Moreover, Essex claims that UPS sabotaged his efforts to comply with its request so that it could use Essex's disobedience as an excuse to fire him. Essex argues that it was not his fault that he did not produce independent verification of his hours. According to Essex, he repeatedly requested that UPS send a written request to his employer explaining the need for verification. Without this request, his second employer would not provide the verification of his hours. UPS refused to send any such letter, but instead told Essex to show his second employer the January 6 letter. Essex says the January 6 letter did not satisfy the request, though, because his second employer needed a request directed to it, not a letter to Essex. Not until UPS received a letter from Essex's second employer on March 1 (the letter was dated February 25) did UPS correspond directly with that employer. In doing so, UPS merely enclosed a copy of its January 6 letter to Essex. Of course, this was all too late because Essex was fired on February 26. Essex also maintains that he did honestly report his hours. He claims that the payroll records UPS relied on are not an accurate reflection of hours worked

because he gets paid for times when he is not actually working, for example, sick days.

Essex grieved his discharge and the arbitrator ruled in favor of UPS.[3] Essex also filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). When Essex received a right to sue letter from the EEOC, he filed the instant action charging UPS with race discrimination and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*[4] The district court granted UPS's motion for summary judgment and Essex now appeals.

## II. Discussion

■■■ We review the grant of summary judgment *de novo. Johnson v. City of Fort Wayne,* 91 F.3d 922, 930 (7th Cir.1996). In evaluating a motion for summary judgment, we read the record, and resolve all inferences, in the light most favorable to the nonmovant. Id. A court may grant summary judgment only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *see also Johnson,* 91 F.3d at 931. Although the moving party has the initial burden to show that the record presents no genuine issue of material fact, if the nonmovant bears the burden of proof, "he must then go beyond the pleadings and affirmatively demonstrate a genuine issue of material fact for trial." *Johnson,* 91 F.3d at 931; *see also Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53. To withstand summary judgment, the nonmovant must demonstrate that the record as a whole permits a rational factfinder to rule in his favor. *Johnson,* 91 F.3d at 931. Where the nonmovant bears the

burden of proof at trial, as he does here, he must put forth "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

■■■ There are two ways to prove a violation of Title VII. First, a plaintiff could present direct evidence of an illegal motive. *Smart v. Ball State University,* 89 F.3d 437, 439 (7th Cir.1996); *Sample v. Aldi Inc.,* 61 F.3d 544, 547 (7th Cir.1995). Essex does not argue on appeal that he has presented direct evidence of either race discrimination or retaliatory discharge. Instead, he relies on the second route: the indirect method of proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of discriminatory discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Although the elements of a prima facie case of race discrimination and retaliation are different, the shifting burdens of production delineated in *McDonnell Douglas* apply to both kinds of claims. *See Hunt–Golliday v. Metropolitan Water Reclamation District,* 104 F.3d 1004, 1014 (7th Cir.1997) (applying *McDonnell Douglas* burden shifting to retaliation claim); *Sample,* 61 F.3d at 547 (applying *McDonnell*

---

3. Essex filed approximately 47 grievances related to the UPS request that he verify his outside hours.

4. Under 42 U.S.C. § 2000e–2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Under 42 U.S.C. § 2000e–3(a), it is unlawful for an employer to discriminate against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Douglas* to race discrimination claim). If a plaintiff makes out a prima facie case, a rebuttable presumption of discrimination is created and the employer must come forward with a legitimate nondiscriminatory reason for discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94. At this point, the burden shifts back to the plaintiff to prove that the employer's proffered reason is pretextual. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. Despite these shifting burdens of production, the ultimate burden of persuasion always remains with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

■ The district court granted UPS's motion for summary judgment on both the race discrimination and the retaliatory discharge claims. First, it held that Essex failed to offer sufficient evidence of race discrimination. To establish a prima facie case of racially discriminatory discharge, a plaintiff must prove four things: 1) he is a member of a protected group; 2) his work met defendant's legitimate expectations; 3) he was discharged despite his performance; and 4) defendant sought to replace plaintiff.[5] *Sample,* 61 F.3d at 548. The district court found that Essex failed to create a genuine issue as to whether he was performing up to UPS's legitimate expectations. UPS's request for verification of Essex's hours was legitimate and Essex failed to provide this information. Even if Essex did establish a prima facie case, the court held that UPS presented a legitimate reason for discharge: insubordination. Essex was insubordinate because he did not obey the UPS demand for verification of the hours Essex worked outside UPS. The court held that Essex failed to present

evidence that UPS's proffered reason was pretextual and thus UPS was entitled to judgment as a matter of law.

■ The district court also held that Essex failed to offer evidence of retaliatory discharge. A plaintiff must show three things to establish a prima facie case of retaliation: 1) plaintiff engaged in statutorily protected activity; 2) he suffered an adverse action; and 3) there is a causal link between the protected activity and the adverse action. *Hunt–Golliday,* 104 F.3d at 1014; *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1459 (7th Cir.1995); *Dey v. Colt Const. & Develop. Co.,* 28 F.3d 1446, 1457 (7th Cir. 1994). The district court held that plaintiff did not make out a prima facie case because he failed to show that his previous charges against UPS were protected activity or that there was a causal link between those charges and his discharge. The district court also held, as with Essex's claim of race discrimination, that Essex failed to present evidence that UPS's proffered reason was pretextual.

■ We need not decide whether Essex adequately made out a prima facie case of either race discrimination or retaliatory discharge. *See EEOC v. Our Lady of the Resurrection Medical Center,* 77 F.3d 145, 149–50 (7th Cir.1996) (advancing to dispositive issue of pretext without deciding if plaintiff established prima facie case and collecting cases). Even assuming he did, Essex must present evidence that UPS's proffered reason for discharge—insubordination—is pretextual in order to succeed on either claim. Because we find that Essex failed to present any evidence from which a finder of fact could reasonably infer pretext, we affirm the district court's grant of summary judgment on both claims.[6]

5. In *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1332 (7th Cir.1995), we recognized that some variation exists as to the proper formulation of the fourth factor in this test. The Supreme Court has since eliminated one possibility, holding that plaintiff's replacement need not fall outside the protected class. *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). See also *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996). Because our holding does not turn on Essex's ability to make out a prima facie

case, however, we need not concern ourselves with other potential variations.

6. UPS also argued on appeal that because Essex arbitrated his allegations of discrimination via the grievance procedure established in his collective bargaining agreement, the federal courts are precluded from hearing a Title VII claim regarding the same factual circumstances. However, the Supreme Court rejected this argument in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94

A plaintiff can prove pretext either by presenting direct evidence that a discriminatory reason motivated the employer's decision or by presenting evidence that the employer's proffered reason is unworthy of credence, thus raising the inference that the real reason is discriminatory. *Johnson,* 91 F.3d at 931; *Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995); *Kralman v. Illinois Dept. of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994). Essex relies on the latter route. In examining pretext, the question is whether the employer honestly believed its proffered reason for discharge. *Sample,* 61 F.3d at 549; *Kralman,* 23 F.3d at 156; *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992). The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual. *Sample,* 61 F.3d at 549; *Kralman,* 23 F.3d at 156; *McCoy,* 957 F.2d at 373. Thus, to prevent summary judgment, Essex must present evidence that UPS is insincere when it claims to have discharged Essex for insubordination. *Kralman,* 23 F.3d at 156; *McCoy,* 957 F.2d at 373.

Essex first argues that he has presented evidence of past discrimination from which a jury could reasonably infer pretext. He claims to have presented evidence that UPS's workforce is "statistically imbalanced." However, Essex presents no actual statistics. Instead, he offers only his opinion in his affidavit that an imbalance exists. Nor has Essex "shown any link between this alleged discrimination and the employment decisions which [Essex] is challenging." *Sample,* 61 F.3d at 551. Essex also argues that he was subject to discriminatory treatment. However, the only example of allegedly differential treatment—having to undergo performance audits allegedly not required of white employees—occurred, at the latest, in 1983. This is too remote to constitute evidence that UPS's reason for discharging Essex in 1993 is pretextual.[7] *See Gadsby,* 71 F.3d at 1330 (holding comment made to another employee five years prior to plaintiff's dismissal too remote to constitute evidence of discrimination against plaintiff); *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 669 (7th Cir.1995) (holding allegedly discriminatory comment made to plaintiff nine years prior to her discharge too remote to constitute evidence of discriminatory discharge). Although Essex argues he was continually subject to discriminatory treatment both before and after the event in 1983, he offers no more than his conclusory allegations that this is so. Thus, Essex has not presented sufficient evidence of past discrimination to create an issue of fact as to pretext. *See Sample,* 61 F.3d at 549 (holding conclusory statements in affidavit that others were treated more favorably did not create issue of fact); *Wixson v. Dowagiac Nursing Home,* 87 F.3d 164, 171 (6th Cir. 1996) (holding affidavits containing "numerous charges of disparate treatment and hostile work environment that are made in general, conclusory terms, but [in which] names, times and occasions are missing" did not create issue of fact as to pretext).

Essex's primary argument, however, is that the requirement that he obtain verification of his outside hours was not a genuine job requirement and was discriminatorily applied to Essex. He bases this claim on three types of evidence. First, Essex offers evidence that there was no UPS policy under which employees were required either to report their outside hours themselves, or obtain verification of those hours. *Essex cites Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1040 (7th Cir.1993), for the proposition that "[w]hen the existence of a uniform policy or practice is in doubt, it cannot serve as a reason for discharging [plaintiff]." However,

___

S.Ct. 1011, 39 L.Ed.2d 147 (1974), and we obviously have no authority to reconsider the issue.

7. In his argument regarding his prima facie case of retaliatory discharge, Essex claims that a supervisor told him that UPS had a different set of rules for Essex and that UPS "would continue after [Essex] until they got something against him." These comments could potentially be presented as evidence of pretext, as well. However, Essex forfeited this argument by not making it until oral argument. *Sample,* 61 F.3d at 551 n. 1. Even if he had made it in his opening brief, the remarks apparently took place in the 1970's, and thus, like the event in 1983, would be too remote to bear on Essex's discharge in 1993.

UPS does not claim it had a policy requiring reporting or independent verification of outside hours. Nor is its proffered reason for discharge that Essex violated a company policy. Rather, UPS claims that Essex disobeyed a specific order, which was directed only to him because he was the only one UPS suspected of violating DOT regulations. Thus, the mere fact that UPS had no reporting policy does not suggest pretext.

■ Second, Essex offers evidence that UPS did not require any other employee to report her outside hours, even though it knew that other employees worked outside jobs. A plaintiff may establish pretext by offering evidence that other similarly situated employees were treated more favorably. *Hargett v. National Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996). UPS does not dispute that prior to its request to Essex, it did not require any other employee to report or verify her hours. However, it claims, and we agree, that Essex has failed to present evidence of any other employee who was similarly situated. Specifically, Essex relies on two pieces of evidence, neither of which reveals a similarly situated employee. Essex offers an affidavit by a white employee averring that he worked "many hours" outside of UPS and his supervisor "was aware of [his] outside work." What does "many hours" mean? We don't know and Essex doesn't tell us. Essex bears the burden to rebut UPS's proffered reason with specific facts. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Simply saying another employee worked "many" hours does not meet this burden with respect to showing there existed a similarly situated white employee. We refuse to speculate as to what the affiant meant by "many." Moreover, the statement that UPS was "aware of [his] outside work" is equivocal. It is not clear whether UPS was aware of the affiant's "many" hours, or only of the fact that he had a second job. Contrary to the suggestion at oral argument, the fact that we do not know the answers to these questions does not mean that plaintiff has demonstrated a genuine issue of fact. Plaintiffs cannot create

issues of fact by pointing to the ambiguity of their own evidence.

Essex also points to the fact that UPS has acknowledged that other employees work part-time jobs outside of UPS. If an employee works a full 40–hour week at UPS, Essex argues, even a part-time job presents the risk of violating the DOT 60–hours–per–week limit. According to Essex, because UPS should have known of the risk that other employees might also be violating DOT regulations, but did not inquire into anyone's hours except Essex's, UPS could not truly have been concerned about complying with the DOT regulations. This argument neglects the fact that Essex is the only employee whom UPS discovered to be working so many hours that he was *actually* violating the DOT regulations. This is a far cry from UPS's alleged knowledge that others *might* be violating the regulations. There is no evidence that UPS knew of any other employee who worked either an essentially full-time second job, or who worked so many hours at another job that she was actually in violation of DOT regulations. Nor does Essex present evidence that UPS believed another employee to be lying when responding to questions about outside hours. Essex argues that he was not lying when he orally reported his hours and that UPS has presented no evidence to support its assertion that he misrepresented them. However, the important question is the honesty, not the accuracy, of UPS's belief. Essex presents no evidence to suggest that UPS did not truly believe, based on the payroll information it had obtained, that Essex was being dishonest. Thus, Essex has failed to present evidence that similarly situated employees were treated more favorably.

Finally, Essex argues that this case is like *Wohl v. Spectrum Manufacturing, Inc.,* 94 F.3d 353 (7th Cir.1996), in which we reversed summary judgment in favor of the defendant because the plaintiff presented evidence that his employer knew that his failure to meet expectations was the fault of another employee. We held that a jury could reasonably infer pretext from evidence that the employer, although claiming to have fired plaintiff because he was responsible for certain job

failures, knew this attribution of responsibility was false. *Id.* Essex claims that, as in *Wohl,* UPS is insincere when it says it fired him for insubordination because UPS knew that Essex was attempting to comply but could not, through no fault of his own. In fact, according to Essex, UPS hampered his efforts to comply. Essex states in the record that he repeatedly requested, beginning sometime in January, that UPS provide a letter to his second employer explaining what UPS needed. Instead of sending a letter, UPS told Essex to show his other employer the January 6 letter. Essex contends, however, that the January 6 letter did not satisfy the second employer's request for a letter addressed to it, not to Essex. Although the record contains averments that Essex tried to show the January 6 letter to his second employer sooner, Essex did not actually give anyone a copy of it until February 24.

The mere fact that Essex was unable to obtain verification through no fault of his own, not undisputed, is insufficient to prove that UPS's proffered reason for discharge is pretextual. Merely shifting the blame does not establish pretext. *See Wohl,* 94 F.3d at 357; *Schultz v. General Electric Capital Corp.,* 37 F.3d 329, 334 (7th Cir.1994), *cert. denied sub nom. Alley v. General Electric Capital Corp.,* —— U.S. ——, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). Essex's counsel conceded at oral argument that Essex alone bore the burden to document his hours. This distinguishes the instant case from *Wohl,* in which several people were responsible for creating the work product deemed deficient. Moreover, Essex has presented no evidence that UPS knew he was making a good faith effort to comply. First, there is no evidence that UPS knew that the January 6 letter was insufficient to satisfy the second employer's request. In fact, when Essex's second employer wrote to UPS requesting information, UPS responded by sending a copy of the January 6 letter. Nor has Essex presented any evidence that UPS knew he

attempted to show the employer the January 6 letter prior to his termination. Essex admits he did not actually leave this letter with his second employer until February 24, after he received his final warning letter.[8] Without evidence that UPS knew Essex was making a good faith effort to comply, a jury could not reasonably infer that UPS is lying when it says it fired Essex for refusing to obtain the requested verification.

### III. Conclusion

In sum, there is no evidence from which a jury could reasonably conclude that UPS fired Essex either because of his race or to retaliate against him. Thus, the decision of the district court is AFFIRMED.

---

**8.** Actually showing the January 6 letter to his second employer, the written request UPS assumed to be sufficient, would naturally be a part of any good faith attempt to obtain the requisite verification. Given how long it took Essex to accomplish this feat, we question whether UPS,

even if it had known of Essex's efforts, would be unjustified in concluding Essex was not making a good faith effort to comply and thus was insubordinate. ood faith effort to comply and thus was insubordinate.