124 F.3d 205
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
James O. SIMPSON, Plaintiff-Appellant,
v.
MONTGOMERY WARD & CO., INC., Defendant-Appellee.
 No. 96-2386.
 United States Court of Appeals, Seventh Circuit.
 July 14, 1997.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 95 C 3543; Ruben Castillo, Judge.
 Before FAIRCHILD,, CUMMINGS, and KANNE, Circuit Judges.
 
 ORDER
 
 1
 James O. Simpson sued his former employer, Montgomery Ward & Co., relying on VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. He had been a commission sales associate from 1987 until he was terminated March 31, 1993. He complained that in 1992 and '93 defendant discriminated against him because of his race (black) and discharged him on the basis of his race and in retaliation for complaints to supervisors regarding unequal treatment because of his race.
 
 
 2
 The district court granted defendant's motion for summary judgment, and Mr. Simpson appeals from the judgment accordingly entered. Although Judge Castillo discussed many facets of the case, his ultimate conclusion was that "Montgomery Ward has articulated a legitimate, non-discriminatory reason for terminating Simpson: customer complaints. And ... the evidence proffered by Simpson fails to raise a genuine issue of fact as to pretext."
 
 BACKGROUND
 
 3
 Simpson worked in the electronics department of defendant's Ford City Mall store in Chicago. When he started, he received an associate guidebook, outlining discipline for misconduct up to termination. He was aware of defendant's emphasis on customer satisfaction.
 
 
 4
 By the spring of 1992, Simpson's supervisor was Brian Bartlette. Bartlette's supervisor was Rick Smith. Both were white. The racial composition of the sales associates at the store was 70 per cent black and 30 per cent white. In the fall of 1992, new associates were hired into the electronics department: three blacks and two whites, Arnie Fulmer and Joe Marzano. A white sales associate, Mary Ellen Buzcko, was terminated on account of customer complaints.
 
 
 5
 Fulmer and Marzano competed with Simpson for top sales volume. From October '92 to February '93, these three men always ranked as the top three associates in terms of sales. Simpson was second in October and February, first in November, and third in December and January.
 
 
 6
 It had been noted as far back as May 1991 that Simpson was "extremely aggressive" but needed more patience and understanding in dealing with customer questions. In the spring of '92 several customers complained that he was rude to them.
 
 
 7
 On December 31, 1992, a customer complained to the group manager of another department about her dissatisfaction with Simpson's treatment of her. The customer explained that she had asked Simpson for a bag to cover the VCR she had purchased because she was riding the bus, and that Simpson told her that it wasn't his responsibility how she got the item home after he sold it to her. Simpson claimed at his deposition that he attempted to help out, but could not find a bag to give her.
 
 
 8
 On January 2, 1993, Simpson received two more complaints. The first customer asked to lodge a formal complaint against Simpson for "treating [him] like shit" upon learning that he wanted to exchange rather than buy a television. The second customer complained in writing that she asked Simpson about a television advertised on sale, but he ignored her after he "decided that [she] didn't have a sale big enough for him." Simpson claimed not to remember the first incident, and asserted that the second incident was either a misunderstanding or a falsification.
 
 
 9
 Following these complaints, on January 7, 1993, Simpson met with Bartlette and Smith, and was informed that he was suspended for three days because his conduct constituted a Class B violation of unbusinesslike conduct under Company guidelines. Bartlette and Smith warned Simpson that further incidents would result in his termination.
 
 
 10
 During a four-day period in mid-March 1993, Bartlette received complaints from four more customers who were upset that Simpson had treated them rudely. Bartlette recorded the details of these complaints in handwriting on sheets attached to forms entitled "Improper Conduct Notices." On March 23, Smith and Bartlette informed Simpson that he was being discharged on account of customer complaints. It does not appear that Simpson was asked to respond to these complaints before he was discharged. Simpson claims that in discharging him defendant discriminated because of race, and also retaliated for complaints to his supervisors concerning unequal treatment because of race. Simpson's only written complaint was a letter to Smith dated December 30, 1992. The letter did not mention race. In the letter, Simpson complained that several unidentified persons were ringing up certain types of sales under Bartlette's clerk number for the purpose of maintaining on their own numbers a higher percentage of more favorable types of sales, and were being afforded other advantages. It appears that the sales persons complained of included one African-American as well as Fulmer and Marzano. By affidavit filed in opposition to the motion for summary judgment, Simpson asserted that as early as October he had complained (apparently orally) to Smith and Bartlette that Marzano and Fulmer had been treated better because they are white; that in February he complained to Bartlette of favoritism toward Marzano and Fulmer and stated his belief that it was based on their race; he testified at his deposition to making several other, similar complaints; and by affidavit he asserted that on March 13, 1993, he told Bartlette that a sales advantage given Marzano yet previously denied Simpson was "blatant discrimination."
 
 DISCUSSION
 
 11
 We review the district court's grant of summary judgment de novo. Essex v. United Parcel Serv., Inc., 111 F.3d 1304, 1308 (7th Cir.1997)[1] In scrutinizing the factual record, we draw all inferences in the light most favorable to Simpson, the nonmoving party. Id. We affirm a summary judgment only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 1. Race Discrimination
 
 12
 Under Title VII, an employer is prohibited from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). "The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race ... and everything else had remained the same." Carson v. Bethlehem. 82 F.3d 157, 158 (7th Cir.1996).
 
 
 13
 To establish a prima facie case of discrimination under the indirect, burden-shifting framework of McDonnell Douglas Corp.v. Green, 411 U.S. 792 (1973), the employee must show that (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. Johnson v. City of Fort Wayne. Ind., 91 F.3d 922, 931 (7th Cir.1996). Once the employee meets that initial burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. If the employer does so, the presumption of discrimination dissolves, and the burden shifts back to the employee to show that the employer's proffered reason was a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Essex, 111 F.3d at 1309.
 
 
 14
 Here, as in many employment discrimination cases, the district court assumed that Simpson had met his prima facie burden in order to focus on the showing of pretext. See e.g., Essex, 111 F.3d at 1309; E.E.O.C. v. Our Lady of Resurrection Med. Ctr., 77 F.3d 145, 149 (7th Cir.1996). Because we differ with one aspect of the district court's analysis concerning pretext, we proceed along a different route and consider first whether the evidence would support a prima facie case.
 
 
 15
 Clearly Simpson belongs to a protected class and suffered an adverse employment action, thus fulfilling McDonnell requirements (1) and (3). Would the evidence support a finding of (2), that he performed satisfactorily? Clearly not. Although he succeeded well at selling, performance without generating customer complaints was of substantial importance. He had provoked several customer complaints of rudeness and the like in the spring of 1992, but had apparently escaped discipline. There were three more complaints on December 31 and January 2, 1993, for which he was suspended and warned that future occurrences would result in discharge. There were four reported complaints in March '93. (We will later discuss the details of these.)
 
 
 16
 There is also a fourth requirement for a prima facie case, that similarly situated employees received more favorable treatment. The evidence would not support a finding that Simpson met the requirement. He offered proof that others generated customer complaints but were not discharged. None, however, had a record close to Simpson's. He had generated customer complaints without being seriously disciplined, had subsequently been the subject of additional complaints, had been suspended and warned, and later continued to generate complaints.
 
 
 17
 Because the evidence, construed favorably to him does not make out a prima facie case, we need not proceed further with the McDonnell formula on the claim that he was discharged on account of his race. Simpson did produce evidence tending to show that Bartlette favored Fulmer and Marzano in certain store practices, and they were white, but that evidence by itself could not support a finding that the discharge of Simpson was based on race. Summary judgment against Simpson on his claim of being discharged on account of his race was appropriate, and to that extent the judgment is affirmed.
 
 II. Retaliation
 
 18
 Title VII declares it unlawful "to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e-3(a).
 
 
 19
 This circuit applies the burden-shifting analysis of McDonnell to claims of retaliatory action. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir.1997). To make a prima facie case, Simpson must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by his employer; and (3) there is a causal link[2] between his protected expression and the adverse action. Id.
 
 
 20
 Simpson produced evidence of protected speech. His December 30 letter may not qualify, but he testified that he made other complaints that Fulmer and Marzano were treated better than blacks. His affidavit describes Bartlette's refusal in February 1993 to approve a price match with a competitor on a sale of a computer Simpson was attempting to make to his customer Carol Morrisette. The following month, on March 13, however, Bartlette approved a price reduction on a sale of a computer Marzano had made to another customer. Simpson complained to Bartlette that, in light of his refusal to approve the price reduction for Morrisette the previous month, his approval of the reduction for Marzano's customer was "blatant discrimination."
 
 
 21
 Thus the evidence particularly, as to his March 13 complaint, would support a prima facie case. The March 13 complaint, if made, would constitute protected speech, the discharge was an adverse action, and the shortness of the time between the complaint and Bartlette's reports culminating in the termination would permit a finding of a causal link. See McClendon, 108 F.3d at 797 (holding 2-3 days sufficient and relying on earlier cases where one day and one week had been deemed appropriate); Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir.1994) (evidence that discharge "took place on the heels of protected activity"--four weeks later (along with another circumstance)--supports inference of causal link); Alexander v. Gerhardt Enters., 40 F.3d 187, 196 (7th Cir.1994); Holland v. Jefferson Nat'l Ins. Co., 883 F.2d 1307, 1314-15 (7th Cir.1989); cf. Hughes v. Derwinski, 967 F.2d 1168 (7th Cir.1992) (lapse of four months did not sufficiently raise inference of causal connection); Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 480 (7th Cir.1995) ("substantial" time lapse of 20 months between events was "counter-evidence" of causal connection).
 
 
 22
 Simpson's showing was sufficient, and takes us to the question whether he has shown pretext.
 
 
 23
 The immediate cause of Simpson's termination, as claimed by defendant, were the events in March described in Bartlette's handwritten notes.[3]
 
 
 24
 A customer approached me in a very angry manner, telling me a sales associate refused to help him, or for that matter failed to get him any assistance.
 
 
 25
 He said he was looking for a CD boom box and sales associate (he identified as Jim Simpson) failed to help him by saying 'that's not my area and I'm busy with other customers.'
 
 
 26
 I tried to calm individual and offered a discount but he could not be satisfied.
 
 
 27
 Customer said the way he was treated he felt like he was told to go stand in a comer with a thumb up his butt.
 
 
 28
 I could not convince him to stop and return to allow me to sell him something--even with offering a heavy discount.
 
 
 29
 He left very unhappy with our service.
 
 
 30
 Simpson confines his argument concerning this complaint to the fact that boom boxes were not sold in his department, so his statement to the customer had been correct. He does not contend that the complaint was not made, nor that the underlying event did not occur.
 
 Bartlette's second report
 3"14
 
 31
 Incident # 2 Approx. 4:00 p.m. 3/13
 
 
 32
 Jim Simpson approached me and complained about needing help in TV area. It was busy and his problem was not that he was servicing 2 and 3 customers at a time, but that they, in his words, all wanted 'cheap shit.'
 
 
 33
 I had Joe Brown finish quickly with customer he was with at register and he proceeded to pick up the slack in TV area.
 
 
 34
 One customer he approached literally thanked him for being available (in my presence). She said that other fellow (identifying Jim Simpson) was rude, impolite, and pushy--rushing off to other customers when he found out she wanted an ad item.
 
 
 35
 Joe calmed her and sold her a TV. We apologized for initial bad impression.
 
 
 36
 She left with merchandise and was made content.
 
 
 37
 At deposition counsel read the report to Simpson and asked, "Do you remember that incident?" And he replied, "Yes, I do." He was then asked if the portrayal was accurate, and he answered that it was not. He first pointed out what he thought was an inconsistency and then said he was with a customer named Martha Valdez during almost two hours, "the whole period of time." In his affidavit he stated, "Regarding the 'cheap shit' incident, I never said those words and I was waiting on a customer at the time Barlette says I did." Mrs. Valdez gave a deposition and corroborated Simpson concerning the time and his dealing with her. The district court regarded his testimony that he remembered the incident as an "explicit acknowledgment of this incident" and failed to interpret Simpson's testimony about being with another customer as a claim of an alibi, saying "Simpson did not even attempt to suggest that the incident did not occur."
 
 
 38
 Judge Castillo did not refer to Simpson's affidavit. Simpson's assertions that he did not use the language ascribed to him and that he was with customer Valdez at the time would have been admissible at trial and were properly presented by affidavit in opposing summary judgment. Fed.R.Civ.P. 56(e). Simpson's testimony that he remembered the "incident," immediately followed by his testimony that the report was not an accurate portrayal, and that he was with a customer when the incident was alleged to have taken place was not an unequivocal admission inconsistent with his affidavit. See Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir.1996); Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir.1995); Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir.1985), discussed in Holland, 883 F.2d at 1314, n. 3.
 
 
 39
 There is a portion of Bartlette's deposition in the record where he described Simpson's remark. "I was with a customer and a sales associate trying to complete their transaction, and Jim came up and slapped his hands on the counter and he says, quote, unquote ... What he said, in front of a customer, portrayed a frustrated, hassled, adamant, non-professional, unbusinesslike conduct." Bartlette recalled that sales associate Brown was present, and Bartlette was helping Ken Van Eaton. Neither Brown nor Van Eaton recalled the incident.
 
 
 40
 We must conclude that there was a dispute whether Simpson made the "cheap shit" remark, but he did not deny that a customer complained that he had been rude, impolite, and pushy.
 
 Bartlette's third report
 3/15/93
 
 41
 As soon as I walked into the dept., a customer approached me & stated she purchased a camcorder which was missing a lithium battery for date/time. She said she had approached Jim Simpson on this and he was very rude and impolite to her.
 
 
 42
 When Jim saw me talking to her, he immediately rushed over (illegible) defend himself.
 
 
 43
 She said to me in his presence that she felt he had hassled and misused her.
 
 
 44
 I was able to locate battery (after I took my coat off) and she left happy. It was an easy situation to solve & I don't know why Jim didn't.
 
 
 45
 Simpson recalled the customer who had bought the camcorder from a different store and was upset about the missing battery. Montgomery Ward does not sell this type of battery and Simpson called Rick Smith, who told him to look around for a battery. Simpson testified that he called Bartlette over and explained matters; he denied that he rushed over after Bartlette talked to the customer.
 
 Bartlette's fourth report
 
 46
 On Tues eve 3/16 a customer came in for a price adjustment on a computer, bought at 47/Damen.
 
 
 47
 Ken brought me the ticket to sign and I said who was it for.
 
 
 48
 On identifying customer I said was not he in here a while back.
 
 
 49
 Customer said he indeed was in our store to purchase one, but was forced out of store by a rude and pushy salesman.
 
 
 50
 Customer stated he was looking at a particular model/series but sales assoc. only wanted him to buy different models.
 
 
 51
 Customer said they went to 47/Damen to get the one they wanted.
 
 
 52
 Upon asking who sales person was, I was handed Jim Simpson business card.
 
 
 53
 When asked on deposition whether he remembered this incident, Simpson said he did not. In his affidavit he said, "I never did the things that Bartlette described regarding this customer."
 
 
 54
 The assertion in the affidavit is that the event complained of did not happen. If considered Simpson's sworn denial would raise an issue of fact on that point. Simpson's testimony had been that he did not remember the incident, surely not an admission or concession that it occurred. We have held that "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken...." Russell, 51 F.3d at 67-68. Here the conflict is between testimony of non-recollection and denial by affidavit of the fact inquired about. Even if the affidavit is considered, Simpson's denial that the event happened as related by the customer does not put in issue Bartlette's assertion that the customer made the complaint. It is the receipt of customer complaints that defendant has articulated as the reason for the discharge.
 
 
 55
 In summary, Simpson has made no showing that the customer complaints early in 1992 nor the three for which he was suspended in January 1993 were not received. Likewise, he has raised no issue whether four complaints were received in March. The disputes between Bartlette and Simpson as to the four complaints do not rise to material issues: (1) whether Simpson made the unbusinesslike remark in the presence of a customer as claimed by Bartlette, and (2) whether in the incident in the third report Simpson reported the customer's difficulty to Bartlette or thrust himself into the conversation after he realized the customer was complaining to Bartlette. Bartlette had also reported a customer complaint concerning Simpson on March 5. Smith took no action on it after he learned that the customer had been drinking.
 
 
 56
 Giving Simpson the benefit of the doubt on each disputed matter, the evidence as a whole would not support a jury finding that defendant's articulated justification was pretext. It appears that defendant chose to rely on the last four complaints at face value without asking Simpson for his version. That may seem unfair and poor personnel policy, but it was defendant's choice and would not be proof that its justification was pretext.
 
 
 57
 The judgment is affirmed. Each party to bear own costs on appeal.
 
 
 
 [1]
 Oddly the Montgomery Ward brief tells us at page 16, "The Seventh Circuit has confirmed that, when it reviews the grant of summary judgment in employment discrimination cases, the court will review a district court's legal conclusions de novo, while it will review the findings of fact under a clearly erroneous standard." (Emphasis ours.) The cases cited in no way support the italicized portion in a summary judgment context, and to that extent defendant's proposed standard of review is incorrect
 
 
 [2]
 A "causal link" can be less than actionable causation. The Eleventh Circuit explained: "We do not construe the 'causal link'... to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden County Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir.1985). This court has quoted Simmons with apparent approval. Hunt-Golliday v. Metropolitan Water Reclamation Dist. Of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir.1997). See also Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1315 n. 4 (7th Cir.1989). The Eighth Circuit has recognized that proof of a "causal link" sufficient to make out a prima facie case for McDonnell purposes may not be "enough to prove pretext and satisfy the third stage of the McDonnell test." Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 272 (8th Cir.1996)
 
 
 [3]
 Bartlette apparently testified to the same events, although only excerpts of his deposition appear in the record on appeal
 Bartlette's first report
 3"14
 Incident # 1 3"13"93 Approx. 2:00 p.m.