**Syamalan NAIR, Plaintiffs,**

v.

**BANK OF AMERICA ILLINOIS, Defendant.**

**No. 95 C 6181.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 19, 1997.

Charmaine Elizabeth Dwyer, Chicago, IL, for Plaintiff.

Syamalan Nair, Chicago, IL, pro se.

Thomas Michael Durkin, James W. Gladden, Jr., Kim Ann Leffert, Mayer, Brown & Platt, Chicago, IL, Maritoni Loquillano Derecho, Adler, Murphy & McQuillen, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, United States Magistrate Judge.

Plaintiff Syamalan Nair challenges his February 1994 discharge from employment with Defendant Bank of America Illinois as a violation of his civil rights. His complaint as amended consists of two counts. In Count I, brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*, Plaintiff claims that Defendant discriminated against him on account of his race and national origin by denying him promotional opportunities, by demoting him, by harassing him, and by discharging him. In the alternative, Plaintiff alleges that the Bank took these actions in retaliation for Plaintiff's filing of discrimination charges in 1986 and again in 1988. Count II mirrors Count I in its claims but alleges a violation of 42 U.S.C. § 1981, not Title VII. Defendant has moved for summary judgment on both counts. For the reasons set forth below, summary judgment is granted in part and denied in part.

### FACTUAL BACKGROUND

The following facts are taken from the Statement of Uncontested Material Facts in Support of Defendant's Motion for Summary Judgment (hereinafter "Def.'s 12(M) Stmt."), Plaintiff's Response to Statement of Uncontested Material Facts in Support of Defendant's Motion for Summary Judgment (hereinafter "Pl.'s 12(N) Stmt."), Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 12(N)(3)(b) Which Require Denial of Defendant's Summary Judgment Motion (hereinafter "Pl.'s 12(N)(3)(b) Stmt."),[1] and depositions and affidavits contained in the record.

On September 10, 1979, Defendant Bank of America Illinois (hereinafter sometimes "the Bank") hired Plaintiff, Syamalan "Sam" Nair, as a Salary Grade 5 clerk and assigned him to its document processing center, the area of the bank where checks presented for deposit are cleared and processed. (Stell Dep. I at 9; Nair Dep. at 32, 33.) Not long afterwards, in 1981, Defendant promoted Plaintiff to a Salary Grade 6 position as a Senior Investigator. (Nair Dep. at 33.) In this new position, Plaintiff "investigated discrepancies in customer accounts" (Def.'s 12(M) Stmt. ¶ 9; Nair Dep. 33, 34), working on the day shift. (Nair Dep. at 35.) In subsequent years as a Senior Investigator, Plaintiff reported to several different supervisors and was assigned to several different sections, but his responsibilities remained largely the same throughout his tenure with the Bank. (Nair Dep. 36, 38.)

It is undisputed that from the beginning of his employment with Defendant, Plaintiff had serious problems with attendance. As early as 1982, one of Plaintiff's supervisors noted that he was "absent and late more often than normal. Often away from work without good reason." (September 1982 Performance Appraisal, Ex. 22 to Def.'s 12(M) Stmt.) Between 1984 and 1991, Plaintiff received seven disciplinary memoranda pursuant to Defendant's attendance policy. (1984–91 Disciplinary Memoranda, Ex. 23 to Def.'s 12(M) Stmt.; Nair Dep. at 98.) Each of these memoranda stated that Defendant expected "an immediate and lasting improvement" in Plaintiff's attendance record, and that failure to show up for work more consistently could have a negative impact on his future performance appraisals and his chances for promotion. (1984–91 Disciplinary Memoranda, Ex. 23 to Def.'s 12(M) Stmt.; Nair Dep. 103, 104.) In July 1991, moreover, yet another supervisor warned Plaintiff that he "must be cautious with his attendance record so that it does not become a factor in his performance." (July 1991 Performance Appraisal, Ex. 24 to Def.'s 12(M) Stmt.)

Plaintiff received a number of performance evaluations during his years as a senior investigator. (Nair Affidavit (hereinafter

---

1. Defendant has not filed a formal response to Pl.'s 12(N)(3)(b) Stmt. Accordingly, pursuant to Local Rule 12(N) this court has deemed admitted any facts in Pl.'s 12(N)(3)(b) Stmt. not specifically controverted in Def.'s 12(M) Stmt.

"Nair Aff.") ¶ 7.) Few of these evaluations were noteworthy,[2] and Plaintiff ultimately grew dissatisfied with how he was rated. In 1986, he commented on one evaluation that "This appraisal does not reflect high standard of my work and achievement. I am being appraised unfairly, as my work exceeds the company standars [sic] for my posistion [sic]." (May 1986 Performance Evaluation, Ex. A to Nair Aff.) He did not, however, provide any detailed reasons for his contention that he should have been rated higher.

Plaintiff was also dissatisfied with Defendant's failure to promote him despite the fact that he was, as he describes it, "fully qualified." (Pl.'s 12(N)(3)(b) Stmt. ¶ 19.) On at least two separate occasions in 1986, Plaintiff applied for, but was denied, Salary Grade 7 positions.[3] (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 19, 21.) Defendant has not responded to Plaintiff's assertion that he was fully qualified for these positions, so this court accepts Plaintiff's assertion as true.

In 1986, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights (hereinafter "IDHR"), alleging that Defendant had failed to promote him and had underrated his performance on account of his national origin. (1986 Charge, Ex. C to Nair Aff.; Nair Aff. ¶ 10.) After filing this charge, he was summoned to meet with Agnes Canning, the Vice President of Defendant's Human Resources Department. (Pl.'s 12(N)(3)(b) Stmt. ¶ 24.) They discussed the allegations in Plaintiff's charge, and Canning allegedly told Plaintiff that she would "make some inquiries" about the possibility of promoting him. (*Id.*) Apparently

dissatisfied with Canning's efforts, Plaintiff filed a similar but slightly modified charge with the Equal Employment Opportunity Commission (hereinafter "EEOC") in 1988;[4] he dropped the claim that Defendant had underrated him and added sex discrimination as a basis for Defendant's failure to promote him. (1988 Charge, Ex. D to Nair Aff.; Nair Aff. ¶ 11.) Both agencies ultimately dismissed the charges as unfounded. (Administrative Charge Dismissals, Exs. 14 and 17 to Def.'s 12(M) Stmt.)

In September 1992, Plaintiff requested a transfer to the night shift.[5] (Scornavacco Dep. at 24, 38; Nair Dep. 43, 281.) At the time of his request, however, Plaintiff acknowledges that the only available position for which he was qualified was a Salary Grade 5 Senior Checker position in the incoming deposits area of the Bank. (Scornavacco Dep. at 23, 28, 49, 154; Nair Dep. at 281.) Proceeding with such a transfer would ordinarily have resulted in a reduction in pay for Plaintiff, but because the salary ranges for grades 5 and 6 overlap and Plaintiff's grade 6 salary in 1992 fell in the range common to both grades (Stell Dep. I at 4), night shift supervisor Barbara Scornavacco informed Plaintiff that his salary would not change upon transferring to the night shift. (Scornavacco Dep. at 40; Nair Dep. at 49.) In fact, because night shift workers receive a premium not offered day shift workers, she also informed Plaintiff that his salary would probably increase if he transferred to the night shift. (Scornavacco Dep. at 49; Stell Dep. I at 38; Nair Dep. at 56, 197.) Thus, Plaintiff decided to go through with the transfer, although it technically constituted a

---

2. It is undisputed that prior to 1986, the year Plaintiff filed a charge with the Illinois Department of Human Rights alleging that his performance had been underrated on account of his race, no supervisor had ever rated his performance higher than "above average." (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 12, 13, 14, 15, 16, 17, 20, 27.) The record is unclear, however, on the range of possible ratings.

3. On April 1, 1986, Plaintiff submitted an internal job posting application for a Salary Grade 7 position as a Financial Control Processor in the Properties Development Division. (Pl.'s 12(N)(3)(b) Stmt. ¶ 19.) Not long thereafter, on May 27, 1986, Plaintiff submitted an internal job posting application for a Salary Grade 7 position

as an Assistant Analyst in Defendant's Commercial Finance Division. (*Id.* ¶ 21.)

4. The later filed EEOC charge appears to have been spurred by two additional rejections for promotion. In June and July of 1987, Plaintiff applied for, but was denied, the positions of Coordinator in the Memo Section of the Central Proof Department and Research Coordinator in the Research Section. (Pl.'s 12(N)(3)(b) Stmt. ¶ 30 .)

5. Plaintiff requested the transfer so that he could be home during the day to care for his school-age children and his ill wife. (Scornavacco Dep. at 36; Nair Dep. at 43.)

demotion. (Transfer Requisition, Ex. 7 to Def.'s 12(M) Stmt.)

Shortly before his transfer took effect, Plaintiff met again with night shift manager Barbara Scornavacco. (Scornavacco Dep. at 15, 35, 44; Nair Dep. at 48.) She gave Plaintiff a brief description of the Senior Checker position, explaining that it would require more standing and lifting than his previous position as a Senior Investigator. (Scornavacco Dep. at 39.) Plaintiff also met separately with his new supervisor on the night shift, Kenneth Stell,[6] but the record suggests that their meeting was more confrontational than it was informative. Stell admits both to having reviewed Plaintiff's personnel file—which included records of the discrimination charges Plaintiff filed with the IDHR and the EEOC[7]—and to having told Plaintiff "I know all about you." (Stell Dep. I at 22–24; Nair Dep. 127–29, 278.)

According to Plaintiff, his employment relationship with Stell never recovered from that initial meeting. Plaintiff claims that he "noticed immediately" after he began working as a Senior Checker on the night shift that Stell disliked him and treated other employees more favorably. (Nair Dep. 276–77.) As proof, Plaintiff points to what he characterizes as acts of "harassment" by Stell. (Plaintiff's Amended Complaint (hereinafter "Pl.'s Amend.Compl." Count I ¶ 9, Count II ¶ 7.) First, he alleges that Stell refused to allow him to start his shift earlier in the evening so that he could be home from work in time to prepare his children for school.[8] (Nair Aff. ¶ 17; Scornavacco Dep. at 89, 157.) Second, he complains that Stell took voluminous notes on him, more than on any other employee. (Nair Aff. ¶ 21; Pl.'s

12(N)(3)(b) Stmt. ¶ 78.) Third, Plaintiff alleges that Stell refused to speak to him during working hours. (Nair Dep. at 144, 277–78; Pl.'s 12(N)(3)(b) Stmt. ¶ 77.) Fourth, he claims that Stell excluded him from at least seven or eight section meetings. (Nair Dep. at 142–44; Pl.'s 12(N)(3)(b) Stmt. ¶ 76.) Finally, he recounts that Stell called him a "damn Indian" and made it difficult for him to leave work one day after he had received word that his son was home having convulsions.[9] (Nair Dep. at 147–48, 154; Pl.'s 12(N)(3)(b) Stmt. ¶ 74.) Significantly, Plaintiff has not provided specific dates for any of these acts of harassment; he notes in this regard only that the "damn Indian" incident occurred "a few months" after he transferred to the night shift. (Pl.'s 12(N)(3)(b) Stmt. ¶ 74.)

The Bank challenges Plaintiff's account. Defendant claims, first, that requests to adjust night shift hours were common but not granted to any employees. (Scornavacco Dep. at 37, 39.) Defendant urges, further, that Stell took notes on everything and everyone as part of his daily routine[10] (id. at 111), and that Stell's failure to speak more frequently with Plaintiff was not the result of personal animosity but of the "busy work environment." (Memorandum in Support of Defendant's Motion for Summary Judgment (hereinafter "Def.'s Mem.Supp.Mot. Summ.J.") at 8.) Defendant points out that there is no evidence other than Plaintiff's subjective perception that Stell spent more time with other employees. (Def.'s Mem. Supp.Mot.Summ.J. at 7.) Finally, Defendant concedes that Stell referred to Plaintiff as a "damn Indian" (Reply in Support of Defendant's Motion for Summary Judgment (hereinafter "Def.'s Reply") at 12), but otherwise

---

6. Stell was one of three night shift supervisors who reported to Scornavacco. (Scornavacco Dep. at 15.)

7. Moreover, Stell admits that Scornavacco told him Plaintiff "had served the bank with some lawsuits in the past." (Stell Dep. I at 17–18.)

8. In his affidavit, Plaintiff alleges without support that "other non-Asian/East Indian employees on the night shift, including Kathy Czubernat, were permitted to work flexible hours[.]" (Nair Aff. ¶ 17.)

9. According to Plaintiff, the day after this incident "Stell was still angry . . . and subjected Nair to a torrent of verbal abuse in which he told Nair that he intended to fire him and threatened to call security." (Pl.'s 12(N)(3)(b) Stmt. ¶ 74.) Plaintiff further asserts that he "feared that Stell intended to strike him during this encounter." (Id.)

10. On this point, Plaintiff has presented copies of numerous pages of notes Stell took on him between December 4, 1992 and January 5, 1994. (Stell Notes, Ex. 13 to Stell Dep.) Defendant has not provided copies of notes Stell took on others.

asserts that the resistance Plaintiff met with from Stell on the day Plaintiff's son fell ill was unfortunate but necessary; time sheets were due that day and Stell was trying to figure out whether Plaintiff wanted paid leave. (Stell Dep. I at 67.) Defendant does not address whether or why Stell allegedly excluded Plaintiff from section meetings.

In addition to being harassed by Stell, Plaintiff claims to have been unjustifiably passed over for promotion on six different occasions after he transferred to the night shift.[11] On each of these occasions, Plaintiff claims that he was "fully qualified" for the position in question but that Defendant either did not consider him for it or did not inform him of the position's availability. (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 62, 66, 84, 86, 88, 89 .) Defendant has not responded to these assertions, so this court accepts them as true.

Meanwhile, Plaintiff's attendance problems continued. On August 13, 1993, Plaintiff received a disciplinary memorandum from Stell for three absence "occurrences" that he had accrued in the previous 12 months. (Scornavacco Dep. at 120; Stell Dep. II at 10; Nair Dep. at 104.) According to the memorandum, Plaintiff had been absent for approximately 10 days in August 1992, for three days in June 1993, and for 20 days in July and August 1993. (8/13/93 Memorandum, Ex. 26 to Def.'s 12(M) Stmt.) The memo also warned that Plaintiff's continued poor attendance could result in lost promotional opportunities and, ultimately, in his termination. (*Id.*) Soon thereafter, on November 1, 1993, Plaintiff began yet another absence occurrence, this one lasting for 28 consecutive business days until December 13, 1993.[12] (12/15/93 Memorandum, Ex. 23 to Def.'s 12(M) Stmt., No. 0000849.) Upon his return, Plaintiff received his second disciplinary memorandum in four months, this one containing a review of Plaintiff's attendance record since 1988. (*Id.;* Scornavacco Dep. at 119, 122–23, 132–33, 134.)

Less than two weeks later, on December 23, 1993, Plaintiff again failed to show up for work and did not return until February 14, 1994.[13] (Canning Dep. 101, Stell Dep. II at 22.) During Plaintiff's absence, Stell and Scornavacco discussed Plaintiff's future prospects with the Bank in light of his abysmal attendance record. (Scornavacco Dep. at 116, 188; Stell Dep. at 94; Stell Dep. II at 23.) After much deliberation, they ultimate-

11. The acts of "non-promotion" referred to by Plaintiff are as follows: (1) Maria Angel's transfer on October 19, 1992 from her position as a Salary Grade 6 Senior Investigator on the day shift to a position as a Salary Grade 7 Control Clerk in the Reconcilement Section of the night shift (Pl.'s 12(N)(3)(b) Stmt. ¶ 66); (2) Audrey Mitchell's promotion on October 26, 1992 from an unknown position on the day shift to the position of Salary Grade 6 Senior Investigator on the night shift (*Id.* ¶ 60); (3) the hiring of Leonirilda Mendoza on March 21, 1993 from outside of the organization to fill a Salary Grade 6 position as a Reconcilement Clerk (*id.* ¶ 84); (4) the promotion of Karen Cosenza on April 1, 1993 from her position as a Salary Grade 6 Senior Reconcilement Clerk to a position as a Salary Grade 7 Control Clerk (*id.* ¶ 86); (5) the promotion of Barbara Frazier on August 1, 1993 from her position as a Salary Grade 6 Direct Send Clerk to a position as Salary Grade 6 Senior Micro Sort Operator (*id.* ¶ 86); and (6) the promotion of Matthew Murawski on September 1, 1993 from his position as Salary Grade 5 Micro Sort Operator Trainee to a position as a Salary Grade 6 Micro Sort Operator (*id.* ¶ 89). It appears that it was Scornavacco who made the decision to promote all of the above persons except Maria Angel, in whose case the record is inconclusive. (Scornavacco Dep. at 33–34 (Mitchell); 73–75 (Mendoza); 81 (Cosenza); 75–76 (Frazier); 78–79 (Murawski).)

12. Plaintiff characterizes this absence as a "medical leave" and asserts that it was caused by "hyperthyroidism and severe anxiety [that resulted from] work-related stress." (Pl.'s 12(N)(3)(b) Stmt. ¶ 95.) The documents Plaintiff has provided in support of this assertion corroborate only Plaintiff's own description of his condition, however, not his assessment as to causation. (Diagnosis of Dr. Carlson, Ex. G to Nair Aff.)

13. Plaintiff attributes this absence, as well, to his medical condition—he asserts that he took this absence on the advice of his psychiatrist, Dr. Robert Grunsten (Pl.'s 12(N)(3)(b) ¶ 99; Grunsten Physician Report, Ex. H to Nair Aff., No. 0000645), who had diagnosed Plaintiff as suffering from "work related stress." (Grunsten Diagnosis Letter, Ex. H to Nair Aff., No. 000056.) Plaintiff notes, moreover, that Dr. Grunsten wrote in a letter to Defendant's Medical Department dated February 9, 1994 that "it would be in everyone's best interest if Mr. Nair could be transferred to working days." (Grunsten Letter to Defendant, Ex. H to Nair Aff., No. 000057.) There is no indication in the record, however, that Canning, Scornavacco, or Stell ever saw this letter.

ly decided to recommend to Agnes Canning, who still occupied the position of Human Resources Vice President, that he be terminated.[14] (Scornavacco Dep. at 116, 117; Canning Dep. at 11, 40, 41; Stell Dep. II at 22.) Canning, who was familiar with Plaintiff's attendance record, agreed with the recommendation. (Canning Dep. at 43, 49, 51, 52, 54, 73.) Accordingly, she terminated. Plaintiff for excessive absenteeism when he returned to work on February 14, 1994. (Termination Letter, Ex. 29 to Def.'s 12(M) Stmt.; Canning Dep. at 40, 69, 71, 72, 83.)

At least two other non-Indian employees who worked in the document processing center were terminated by Defendant for excessive absenteeism within a few months of Plaintiff's termination.[15] Craig Williams was hired on March 9, 1987 and received a total of eight disciplinary memoranda for poor attendance prior to being terminated on September 2, 1993. (Def.'s 12(M) Stmt. ¶ 49.) Derrick Staggs was hired on May 16, 1994 as a Night Shift Sorter and terminated on June 21, 1994, after accumulating one absence and three tardies in this brief stint. (Id. ¶ 50.) It is unclear from the record whether Canning made the final decision to terminate either Williams or Staggs; what is clear is that Scornavacco recommended Williams's termination (Williams Termination Memorandum, Ex. 31 to Def.'s 12(M) Stmt.) and that Stell recommended Staggs's. (Staggs Termination Memorandum, Ex. 32 to Def.'s 12(M) Stmt.)

At least two non-Indian employees with poor attendance records were not terminat-

ed, however. In the case of Olivia Haley, Defendant explains that she was receiving, and continues to receive, benefits under Defendant's long term disability plan—Defendant found her eligible for long term disability benefits on April 3, 1991 and she has not returned to work since. (Def.'s 12(M) Stmt. ¶ 54.) Plaintiff has neither contested that Haley's absences were. justified by her disability nor alleged that he was eligible for such benefits. (Pl.'s 12(N) Stmt. ¶¶ 54, 55.) The case of Lionel Uribe is murkier; Uribe was hired on March 1, 1990 and "resigned his position" on September 22, 1994. (Def.'s 12(M) Stmt. ¶ 52.) During his employment at the Bank, he received numerous disciplinary memoranda for poor attendance. (Id.) Defendant claims that Uribe would have been terminated. for excessive absenteeism had he not first resigned (id.); indeed, Plaintiff himself. points out that Uribe received a "final warning" for poor attendance on April 13, 1994.[16] (Pl.'s 12(N)(3)(b) Stmt. ¶ 105.) But Uribe did not resign until September 22, 1994—a full five months after he received the final warning—and it is unclear whether he resigned during the next absence period to follow receipt of the final warning.

According to Plaintiff, his termination for excessive absenteeism did not comport with the procedures mandated by Defendant's attendance policy, the substance of which is hotly disputed by the parties. Plaintiff claims that Defendant's attendance policy at the time he was terminated authorized dismissal only when an employee had accrued six absence "occurrences"[17] in a 12–month

---

**14.** It is unclear from the record precisely when Scornavacco and Stell arrived at this decision. It is also unclear whether Stell and Scornavacco took the alleged reason for Plaintiff's November and December absences, work-related stress, into account in deciding to recommend his termination. Indeed, the record is silent as to whether Stell and Scornavacco even knew of this reason.

**15.** A third, Karen Cosenza, was terminated as well, but as Plaintiff urges (Pl.'s 12(N) Stmt. ¶ 51), Defendant has failed to lay a proper evidentiary foundation for the evidence on this point (Plaintiff does not similarly challenge the records concerning Williams and Staggs, presumably because the record contains deposition testimony that authenticates these records). Ac-

cordingly, any documents pertaining to Cosenza's termination are inadmissible and will not be considered by this court.

**16.** Plaintiff has not provided a citation for this assertion in his statement of material facts, but there is independent support for it in the record. (Uribe. Final Warning Memorandum, Ex. 34 to Def.'s 12(M) Stmt.)

**17.** An absence "occurrence" under Defendant's original policy is simply an absence period; that is, any number of consecutive days absent constituted one occurrence. Two instances of tardiness counted as one occurrence. (Def.'s 12(M) Stmt. ¶ 33; Scornavacco Dep. 99, 100.) The parties dispute the extent to which the reason for the absence occurrence played a role in deter-

period, and then only if the employee had received four warning memoranda under the progressive warning system set forth in the policy. Plaintiff asserts that he had only accrued four absence occurrences and two warning memoranda prior to his termination. (Pl.'s 12(N)(3)(b) Stmt. ¶ 94.) Defendant does not dispute that Plaintiff had fewer than six absence occurrences and had been issued fewer than four warning memoranda in the 12–month period prior to his dismissal,[18] but argues that Plaintiff was properly dismissed under its attendance policy because the policy specifically provides that "Possible termination will be reviewed in light of the individual circumstances and attendance patterns demonstrated by the employee." (Def.'s Reply at 13; Def.'s 12(M) Stmt. ¶ 35; Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.) This court notes, moreover, that the policy identifies the progressive warning system as a "guideline" for "flagging potential documentation." (Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.) Plaintiff also claims that Defendant based its decision to terminate him on his entire history of poor attendance at the Bank, instead of focusing exclusively on his attendance record in the 12–month period prior to his termination, as the policy requires. (Plaintiff's Memorandum of Law in Opposition to Defendant's Summary Judgment Motion (hereinafter "Pl.'s Opp.Mem.")

at 12.) Defendant concedes that it took Plaintiff's long history of poor attendance into account in making the decision to terminate him (Canning Dep. at 49), but relying once again on the above-quoted language of the policy, counters that the attendance policy permitted it do so. (Def.'s Reply at 13; Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.)

Plaintiff also claims that at least one non-Indian employee, Craig Williams, was allowed six absences and issued four warnings prior to being terminated. (Pl.'s 12(N)(3)(b) Stmt. ¶ 103.) Defendant asserts that Williams was allowed only five absences (it concedes Williams was issued four warnings), but this assertion is contradicted by the available documentation on Williams's attendance history at the Bank. According to a memorandum dated September 2, 1993, Williams had accrued five absences and two tardies—for a total of six absence occurrences—in the 12–month period prior to his discharge. (Williams Memorandum, Ex. 31 to Def.'s 12(M) Stmt., No. 0000955.) Plaintiff does not contest, however, that Derrick Staggs, a second non-Indian employee terminated by the Bank around the time of Plaintiff's termination, had only two-and-a-half absence occurrences in his five-week tenure prior to being terminated on June 21, 1994.[19] (Def.'s 12(M) Stmt. ¶ 50.)

mining whether discipline for poor attendance was appropriate. Defendant asserts that it was not a factor at all. (Def.'s 12(M) Stmt. ¶ 36, *citing* Scornavacco Dep. at 101, 102 (noting that the Bank's Medical Department, not its Human Resources Department, documented the reasons for an employee's absence); Canning Dep. at 53, 58, 70 (noting that the Human Resources Department did not take excuses into account in Plaintiff's case).) Given the articulated reason for the Bank's more generous treatment of Olivia Haley (discussed *infra* p. 48), the court understands Defendant's position to be that the reason for an absence played no role unless the employee qualified for disability benefits. Plaintiff asserts that Defendant's policy required it to consider the reasons for an employee's absence in deciding whether to mete out discipline, pointing to language in the attendance policy that provides "Possible termination will be reviewed in light of the individual circumstances and attendance patterns demonstrated by the employee." (Pl.'s 12(N) Stmt. ¶ 36; Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.) Plaintiff has presented no evidence that the reasons for an employee's ab-

sence were considered with respect to any other employee.

18. Defendant disputes Plaintiff's assertion that he had accrued four absence occurrences and had been issued two warning memoranda in the 12–month period prior to his termination; it claims that Plaintiff had accrued five absence occurrences and that he had been issued three warning memoranda. (Def.'s Reply at 13.) From this court's independent review of the record, it appears that Plaintiff had in fact accrued five absences but had been issued only two warning memoranda in the 12–month period prior to his discharge. (Def.'s 12(M) Stmt. ¶¶ 40, 41, 43.)

19. Nair does claim, however, that Staggs was terminated after Defendant made certain changes in its attendance policy that did not apply to him. According to Plaintiff, "On or about March 24, 1994, over a month after Nair was discharged, Defendant issued a memorandum announcing changes in its attendance policy which gave managers greater latitude in disciplining and discharging employees based upon their attendance." (Pl.'s 12(N)(3)(b) Stmt. ¶ 102;

Not long after he was discharged, on May 26, 1994, Plaintiff filed a Charge of Discrimination with the EEOC, claiming that he had been harassed and fired by Defendant in retaliation for having filed discrimination charges against it in 1986 and 1988. (1994 Charge, Ex. A to Pl.'s Amend.Compl.) In connection with that charge, Plaintiff sent three letters to the EEOC. The first, dated July 24, 1995, was a letter to "Mr. Carl," the EEOC investigator assigned to Plaintiff's charge. Plaintiff apparently wrote the letter on the heels of the EEOC's dismissal of his charge—a finding that neither side has detailed in the record—because the letter can fairly be interpreted as a request for further review. (Letter to Mr. Carl, Attached Ex. to Def.'s Mem.Supp.Mot.Summ.J.) [20] Significantly, Plaintiff wrote in a postscript to the letter that Defendant's alleged misconduct "was purely a retaliation[.]" (*Id.*) The second letter was a copy of a letter Plaintiff had sent on February 7, 1994 to Tom Theobold, Defendant's Chairman. In it, Plaintiff, who was then on an extended absence, describes in detail his dissatisfaction at not having been promoted more frequently during his employment, despite what he characterizes as years of hard work and ingenuity. (Theobold Letter, Ex. 17 to Nair Dep.) He does not, however, attribute Defendant's failure to promote him to either race/national origin discrimination or retaliation, but rather to the "curious phenomenon ... that when people do things a certain way over an extended period of time, they invariably become intolerant toward new approaches to solving problems and getting things done, even if those approaches and ways of doing things are more efficient and more productive." (*Id.*) In any event, there is no evidence in the record that Stell, Scornavacco, or Canning knew about the letter's existence at any point during Plaintiff's employment with the Bank. The third and final letter was a copy of a letter Plaintiff purports to have sent on February 25, 1994 to Human Resources Vice President Agnes Canning, a letter that Plaintiff asserts addresses "in detail his claims of race and national origin discrimination[.]" (Pl.'s Opp.Mem. at 14.) The contents of the letter are unknown to this court, however, because Plaintiff has not offered a copy as an exhibit.

### PROCEDURAL HISTORY

On October 25, 1995, Plaintiff filed a *pro se* complaint claiming that he had been denied promotional opportunities and terminated by Defendant on account of his race, color, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964. The complaint also alleged that Defendant terminated Plaintiff in retaliation for his having filed discrimination charges against it, also in violation of Title VII.

On November 22, 1996, Plaintiff, now represented by counsel, filed a two-count amended complaint. In Count I, Plaintiff claims that Defendant discriminated against him on account of his race and national origin and retaliated against him in violation of Title VII in at least four ways: (1) by denying him promotional opportunities; (2) by downgrading him to the night shift in October of 1992, and subsequently assigning him to "undesirable job duties"; (3) by singling him out for harassment and unwarranted criticism; and (4) by disciplining and discharging him. In Count II, Plaintiff repeats his claims of misconduct, but alleges that they violate 42 U.S.C. § 1981, not Title VII. Defendant has moved for summary judgment on both counts.[21]

### DISCUSSION

#### A. Standard of Review

Summary judgment is appropriate whenever the pleadings, depositions, answers to interrogatories, and admissions on file, together with any submitted affidavits, fail to

---

Attendance Incentive Program, Ex. 10 to Stell Dep., No. 0000955.) Plaintiff has not, however, pointed to any language in the "new" attendance policy that supports such a change. This court finds no indication in the language of the policy itself that any such change was either made or intended.

**20.** This letter was not included in Defendant's formal exhibit list, but Plaintiff has not objected to it as lacking evidentiary foundation.

**21.** On March 12, 1997, both parties consented to proceed before this court pursuant to 28 U.S.C. § 636(c).

raise "a genuine issue of material fact[.]" FED.R.CIV.P. 56(c). Consistent with the procedure's underlying purpose of expediting litigation, a court must grant a motion for summary judgment if, viewing the record as a whole, it determines that a rational trier of fact could not logically find in favor of the non-movant were the case to proceed to trial. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir.1996)). Thus, in cases where a litigant's claim depends upon proof of multiple elements, summary judgment should enter against her if the record fails to establish sufficiently the existence of any one of those elements. *Celotex Corp. v. Catrett*, 477 U.S. at 322.

The moving party bears the burden of production in a summary judgment action. *Santaella v. Metropolitan Life Insurance Co.*, 123 F.3d 456, 460 (7th Cir.1997). Accordingly, "[i]t must identify those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* Once the movant satisfies this burden, the nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e). To do so, the nonmovant must do something more than merely "raise a 'metaphysical doubt' as to the material facts." *See, e.g., Gleason*, 118 F.3d at 1139 (citing *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). This court is required neither to "scour the record in search of a genuine issue of material fact," *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995), nor to "draw every conceivable inference in favor of the nonmoving party." *Id.* Rather, this court ought only to allow those inferences that are reasonable and that present a "sufficient disagreement to require submission to a jury." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). With these standards in mind, this court turns to the summary judgment motion before it for decision.

## B. Count I of Plaintiff's Amended Complaint: The Title VII Claims

In support of its motion for summary judgment, Defendant argues that Plaintiff's discrimination and retaliation claims under Title VII should be dismissed. Defendant contends, first, that Plaintiff's Title VII race and national origin discrimination claim should be dismissed because Plaintiff charged Defendant only with retaliation and not race or national origin discrimination in his underlying EEOC charge. (Def.'s Mem.Supp.Mot. Summ.J. at 5.) Plaintiff's retaliation claim under Title VII should also be dismissed, Defendant contends, for two reasons. First, it argues that with the exception of Plaintiff's retaliatory discharge claim, all of Plaintiff's retaliation claims are time barred because Plaintiff failed to file an EEOC charge within 300 days of the acts that gave rise to each. Second, it argues that Plaintiff's retaliatory discharge claim and any remaining retaliation claims fail because Plaintiff cannot establish the required causal link between his protected activity and the Bank's adverse action. (*Id.* at 14–15.)

In his response, Plaintiff argues that his Title VII race and national origin discrimination claims are properly before this court because they are "like or reasonably related" to his retaliation claim. (Pl.'s Opp.Mem. at 13–14.) With respect to his claim of retaliation, Plaintiff argues that he will be able to establish a prima-facie case for retaliation at trial, and insists that the discriminatory acts underlying each claim are part of a "continuing violation" that persisted to a point within the limitations period applicable for each claim. (*Id.* at 10, 12.) The court addresses all of these arguments below.

### 1. Plaintiff's Title VII Race and National Origin Discrimination Claims

■ As a general rule, a Title VII plaintiff may not include in her complaint claims that she failed to include in her EEOC charge. *McKenzie*, 92 F.3d at 481 (citing *Cheek v. Western and Southern Life Insurance Co.*, 31 F.3d 497, 500 (7th Cir.1994); *Harper v. Godfrey Co.*, 45 F.3d 143, 147 (7th Cir.1995)). The rule serves two purposes. First, the

rule encourages claimants to fully develop their EEOC charges before resorting to the courts, and thus serves Title VII's goal of "affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *McKenzie*, 92 F.3d at 481 (quoting *Cheek*, 31 F.3d at 501). Second, the rule ensures that an employer sued under Title VII will receive adequate notice of the charges brought against her. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992). The rule is not jurisdictional, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), and so must be raised by the defendant as an affirmative defense. *Cheek*, 31 F.3d at 500.

██ Because, however, most EEOC charges are completed by laypersons and not lawyers, the rule does not stubbornly require Title VII plaintiffs to "allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.* Rather, the rule affords Title VII plaintiffs "significant leeway" in this regard, *id.*, requiring only that the Title VII claim in the complaint be "like or reasonably related to the allegations of the [EEOC] charge" or that it "grow" out of those allegations. *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.1976) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir.1971)). Put another way, courts will permit a Title VII plaintiff to bring a claim not specifically asserted in her EEOC charge as long as (1) there is a reasonable relationship between the allegations in the EEOC charge and the claim in the complaint, or (2) the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge. *Harper*, 45 F.3d at 147; *Cheek*, 31 F.3d at 500. With respect to the first prong of the test, a claim in a judicial complaint is "like or reasonably related" to a claim in an EEOC charge if there is a factual relationship between them; that is, if a reasonable person could infer the claim sought to be asserted in the judicial complaint from the factual allegations set forth in the EEOC charge. *O'Rourke v. Continental Casualty Co.*, 983 F.2d 94, 98 (7th Cir.1993) (H.Wood, J., concurring) (observing that "It is enough,

as suggested in *Steffen* [*v. Meridian Life Ins. Co.*, 859 F.2d 534, 544–45 (7th Cir. 1988) ], that a reasonable person might merely be able to infer [the judicial claim] from the charge allegations").

Although the Seventh Circuit has not addressed the precise issue raised by this case—whether an EEOC charge of retaliation is a sufficient predicate for a race discrimination claim in a subsequent civil suit— it has held that an EEOC charge of retaliation is an insufficient predicate for an age discrimination claim. *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258–59 (7th Cir.1996). The *Noreuil* case arose when the plaintiff, John Noreuil, sought to return to his job at Peabody Coal Company after taking a medical leave of absence and was advised that his position had been eliminated. Soon thereafter, Noreuil filed a retaliation charge with the EEOC, alleging that an earlier, unrelated age discrimination claim that he had filed against Peabody had motivated his forced retirement. The EEOC dismissed the charge and Noreuil filed suit in federal court, now claiming that his forced retirement was the product of age discrimination, not retaliation. Peabody moved for summary judgment, arguing that Noreuil's age discrimination claim was procedurally barred because Noreuil had failed to file a prior administrative charge encompassing that claim. The district court granted Peabody's motion, and on appeal the Seventh Circuit affirmed, holding that Noreuil's age discrimination claim neither grew out of his retaliation charge nor related to it factually.

In reaching its conclusion, the court first disposed of the possibility that the retaliation charge and Noreuil's subsequent age discrimination claim were factually related, noting that Noreuil had conceded in his response to Peabody's motion for summary judgment that the administrative charge "was specifically limited to a claim of 'retaliation for the filing of a previous charge ...'" *Noreuil*, 96 F.3d at 257, 259. Turning to the question of whether Noreuil's age discrimination claim "grew out of" his prior administrative charge of retaliation, the court began by observing that "retaliation and age discrimination claims [based on a theory of disparate

*treatment* ] are sufficiently dissimilar that an administrative charge of one fails to support a subsequent civil suit for the other." *Id.* at 258 (citations omitted). The justification for this view, the court continued, is that retaliation and disparate treatment claims involve different questions of intent—retaliation claims require a determination of whether "an adverse employment consequence was deliberately attached to the plaintiff's exercise of a protected right" and disparate treatment claims a determination of whether "the employer's adverse employment decision was motivated by the plaintiff's age." *Id.* The fact that Noreuil's age claim was predicated upon a theory of disparate impact only reinforced the court's conclusion, because the court noted that such claims are "even more conceptually distinct" from retaliation claims than disparate treatment claims. *Id.*

*Noreuil* supports Defendant Bank's argument that Nair's race and national origin discrimination claims are legally unrelated to the retaliation claim asserted in his underlying EEOC charge. That argument finds additional support in two other Seventh Circuit cases. In *O'Rourke v. Continental Casualty Co.*, 983 F.2d 94, 97 (7th Cir.1993), and *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir.1993), the court considered the issue of whether a charge of age discrimination filed with the EEOC is a sufficient predicate for a court complaint alleging retaliation. In *O'Rourke*, the Seventh Circuit answered that question in the negative. The plaintiff there had been fired by his employer, Continental Casualty Company (hereinafter "CNA"), in 1975, but was reinstated soon after he filed a charge of age discrimination against CNA with the EEOC. In 1986, CNA fired O'Rourke for the second time, and O'Rourke again responded by filing a charge of age discrimination with the EEOC. This time CNA held firm, and O'Rourke proceeded to federal court. In 1990, four years after litigation had commenced, O'Rourke learned through the deposition testimony of a coworker that his discharge may have had some connection to his filing of age discrimi-

nation charges in 1975, and the district court permitted him to amend his complaint to include a claim of retaliatory discharge. After a jury found for O'Rourke on the retaliation claim (it rejected his age discrimination claim), CNA appealed, arguing that the district court improperly granted O'Rourke leave to add that claim to his complaint. The Seventh Circuit agreed, concluding that CNA had insufficient notice of O'Rourke's retaliation claim because O'Rourke failed to allege any facts—he failed even to mention the prior charge of discrimination in 1975—from which retaliation could be inferred in his underlying EEOC charge.[22] *O'Rourke*, 983 F.2d at 97. This was critical, the court observed, because retaliation and age discrimination are "unrelated as a matter of law[.]" *Id.* As the court explained, " 'Retaliation' is shorthand for 'adverse consequence deliberately attached to the exercise of a right protected by law;' " thus, O'Rourke's failure to mention his prior charge of discrimination in the underlying EEOC charge left no facts from which CNA could infer retaliation. *Id.* Consequently, CNA was not alerted to the possibility of retaliation until O'Rourke sought leave to amend his complaint in 1990, a full four years after O'Rourke had filed suit against it. *Id.*

*O'Rourke* broadly concluded that age discrimination and retaliation are unrelated claims. In *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir.1993), the court reached a different result, concluding that a three-count complaint filed by two employees against their former employer appropriately included a retaliation claim on behalf of one of the two because the underlying EEOC charges adequately alerted the employer to facts supporting the claim of retaliation. Noting that "EEOC charges are to be read broadly," *id.* at 368, the court observed that the retaliation claim asserted by one plaintiff stemmed from his efforts to resist what he believed to be age discrimination by his employer against the other plaintiff. In light of this factual overlap, the court

---

**22.** As a second reason for denying O'Rourke leave, the court noted that he had waited seven months to request leave to amend after allegedly learning, through deposition testimony, of a pos-

sible connection between his termination and the filing of charges in 1975. *O'Rourke*, 983 F.2d at 97.

concluded that the two administrative charges put Hussman "on formal notice of a [retaliation] problem," *id.* at 368–69, and therefore that on these facts "a strict and technical application of the [scope-of-the-charge] rule would subvert the remedial purposes of the [ADEA]." *Id.* at 368. It also noted in passing that "even a perfunctory investigation of the charges [should] have revealed the retaliation aspect of the whole." *Id.*

■ In this case, Plaintiff charged Defendant with unlawful retaliation—and not race or national origin discrimination—in his EEOC charge. He insists, however, that "A fair reading of the Charge of Discrimination and other documents submitted to the [EEOC] during the course of its investigation shows that all of the factual allegations made by Nair in this lawsuit were either included in his charge or encompassed by the agency's investigation of the charge." (Pl.'s Opp. Mem. at 14). This court disagrees. First, like the EEOC charge filed by the plaintiff in *O'Rourke*, Nair's EEOC charge contains no factual allegations from which a claim of race or national origin discrimination may be inferred. It contains, rather, factual allegations that point unmistakably to a claim of retaliation. The factual allegations in the EEOC charge are that: (a) Plaintiff was hired by Defendant on September 10, 1979 and soon thereafter began work as a Senior Investigator in the Central Proof Department; (b) Plaintiff believed he was being denied promotional opportunities on account of his national origin and therefore filed discrimination charges with the IDHR and EEOC in 1986 and 1988, respectively; (c) subsequent to the filing of those charges, Plaintiff was both "harassed to the point where [he] was experiencing physical illness caused by work-related stress"; and (d) terminated on February 14, 1994. (1994 Charge, Ex. A to Pl.'s Amend.Compl.) These allegations suggest retaliation; they purport to describe "a telling temporal sequence" that began with Plaintiff's IDHR and EEOC filings and culminated in his alleged harassment and termination. *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir.1989). Unlike the circumstances in *Kristufek*, moreover, there is no additional con-

text here from which Defendant could have inferred a claim of race or national origin discrimination.

Plaintiff's makes three arguments to the contrary. He contends, first, that the EEOC charge points to a pattern of racially discriminatory conduct because in that charge he refers to (1) Defendant's failure to promote him, (2) his past EEOC discrimination claims, and (3) to "harassment at [Defendant's] facility" so severe that it led to physical illness. (Pl.'s Opp.Mem. at 14.) Again, the court concludes the argument must be rejected. To begin with, even read liberally, the EEOC charge appears to mention Defendant's failure to promote him only to explain his decision to file discrimination charges in 1986 and 1988. Second, *every* EEOC complaint alleging retaliation for the filing of discrimination charges will likely touch upon past discrimination charges made by the complainant, because an essential predicate for a finding of retaliation is the exercise of a right—here, the filing of charges—protected by law. *O'Rourke*, 983 F.2d at 97. Finally, Plaintiff's vague reference in the EEOC charge to having experienced "harassment at Respondent's facility" after filing discrimination charges is not, as Plaintiff implies, unmistakable shorthand for race-based discrimination. In his EEOC charge, Plaintiff specifically notes that the alleged harassment began "[s]ubsequent to the filing of [Plaintiff's discrimination] charges" (1994 Charge, Ex. A to Pl.'s Amend.Compl.), implying that the harassment was retaliatory in nature. This is significant because, as discussed above, retaliation and discrimination are separate and distinct wrongs. Indeed, the very gist of a retaliatory harassment action is that the employer has "lashed out" against an employee for filing discrimination charges, not out of animosity for the employee's race or national origin. Put another way, a reasonable person would infer that the harassment of which Plaintiff complained in his EEOC charge was motivated by his previous charges, not by his race or national origin.

Nor has Plaintiff established that the EEOC could reasonably have been expected to investigate race or national origin discrim-

ination from the particulars of Plaintiff's retaliation charge. In the charge's narrative, Plaintiff specifically alleged that he was "terminated in retaliation for filing charges against [Defendant] in violation of Title VII of the Civil Rights Act of 1964[.]" (1994 Charge, Ex. A to Pl.'s Amend.Compl.) Further, in the portion of the EEOC charge that required Plaintiff to identify the nature of his grievance, he marked only the box labeled "retaliation" and left conspicuously blank the boxes labeled "race" and "national origin." (*Id.*) Finally, as if to confirm the charge's literal language, Nair wrote a letter to the assigned EEOC investigator (identified only as "Mr. Carl") in which he emphasized that Defendant's alleged misconduct was "purely a retaliation[.]" (Attached Ex. to Def.'s Mem. Supp.Mot.Summ.J.) On these facts, the EEOC cannot reasonably have been expected to read Plaintiff's EEOC charge as raising the issue of race or national origin discrimination.[23] Accordingly, the Seventh Circuit's holding that discrimination and retaliation are "unrelated as a matter of law" controls. *O'Rourke*, 983 F.2d at 97.

Plaintiff makes no attempt to distinguish Seventh Circuit caselaw on this issue, but argues instead that on the facts of the present case the EEOC had sufficient notice of his discrimination claim to pursue an investigation. According to Plaintiff, he submitted to the EEOC two letters he wrote to agents of the Defendant—one to Defendant's Chairman Tom Theobold and the other to Vice President of Human Resources Agnes Canning—"address[ing] in detail his claims of race and national origin discrimination[.]" (Pl.'s Opp.Mem. at 14.) This court concludes, however, that neither letter supports Plaintiff's argument. First, in the letter to

Mr. Theobold, Plaintiff discusses not race or national origin discrimination but rather his dissatisfaction with having been promoted only once during his employment with Defendant, despite what he characterizes as years of hard work and ingenuity. On these facts, this court agrees with Defendant that "there [was] nothing in the letter from which the EEOC could rely to investigate race or national origin discrimination." (Def.'s Reply at 2.) The other letter upon which Plaintiff relies, described in his opposition memorandum as a February 25, 1994 letter to Human Resources Vice President Agnes Canning, is neither identified as an exhibit nor attached to any documents Plaintiff has submitted pursuant to Local Rule 12(N). Accordingly, this court must proceed as if Plaintiff had failed to prove the letter's contents. *See* Fed.R.Civ.P. 56(e) (requiring parties opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial"); *Richards*, 55 F.3d at 251 (noting that it is not the task of the reviewing court "to scour the record in search of a genuine issue of triable fact" in determining whether a party opposing summary judgment has met its burden of production under Fed.R.Civ.P. 56(e)). In conclusion, Plaintiff's race and national origin discrimination claim must be dismissed because Plaintiff has failed to demonstrate that it fell within the scope of the underlying EEOC charge.

### 2. Plaintiff's Retaliation Claims

As noted above, Defendant challenges Plaintiff's retaliation claims on two grounds, one procedural and the other substantive. First, Defendant argues that the claims are untimely because the acts underlying each

---

**23.** This court's conclusion finds considerable support in the Eighth Circuit's decision in *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218 (8th Cir.1994), a decision cited by Defendant that addresses the precise issue raised by this case. There, an African–American woman who was denied a promotion and a "merit raise" sued her employer under Title VII, alleging, *inter alia*, that the denial constituted unlawful race discrimination. Her employer moved for summary judgment on this claim, arguing that because the plaintiff had alleged only retaliation—and not discrimination—in her EEOC complaint, she had failed to fully exhaust her administrative remedies. The district court agreed, and the court of appeals for the Eighth Circuit affirmed, noting:

> Not only did [the plaintiff] fail to check the box for race discrimination, her 1990 EEOC charge does not even hint of a claim of race discrimination. This amounts to more than a mere technicality and is the product of an unconstrained reading of [the plaintiff's] charge. The only claim properly addressed by the EEOC administrative processes was that of retaliation.

*Id.* at 223 (citations and internal quotations omitted).

claim occurred more than 300 days before Plaintiff filed his May 26, 1994 EEOC charge. Second, Defendant urges that there is no causal link between the protected activity engaged in by Plaintiff and any adverse action subsequently visited upon him. Whether Plaintiff's retaliation claims can overcome either of these challenges is discussed below.

### a. Timeliness of Plaintiff's Retaliation Claims

In Illinois, claims brought pursuant to Title VII of the Civil Rights Act are subject to a 300-day statutory limitations period. 42 U.S.C. § 2000(e)-5(e); *Lorance v. AT&T Technologies, Inc.*, 827 F.2d 163, 165 (7th Cir.1987), *aff'd*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). To satisfy this time requirement, a plaintiff must file an EEOC charge within 300 days of the occurrence of an allegedly discriminatory act. *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 707 (7th Cir.1995); *Lorance*, 827 F.2d at 165–66. In this case, Plaintiff filed his charge with the EEOC on May 26, 1994. (1994 Charge, Ex. A to Pl.'s Amend.Compl.) Thus, unless Plaintiff successfully argues for equitable tolling of the statutory limitations period, he is barred from bringing any claims arising from acts of the Defendant that occurred before July 30, 1993. This would immediately defeat his retaliatory demotion claim, jeopardize his retaliatory harassment claim, and eliminate most of his retaliatory failure to promote claim.

Plaintiff's demotion claim is based solely on his transfer to the night shift in September 1992, an isolated event far too old to be cognizable. With respect to his harassment claim, Plaintiff has failed to provide even a single date for the various acts of harassment alleged. But Defendant has failed to identify even one act of harassment as outside the relevant time frame, and the court must, at this stage, draw inferences in favor of the non-moving party on this issue. Accordingly, Plaintiff's harassment claim remains intact. Finally, only two alleged acts of "non-promotion" fall within the 300-day limitations period: Defendant's promotion of Barbara Frazier from a Salary Grade 6 Direct Send Clerk position to a Salary Grade 6 Senior

Micro Sort Operator on August 1, 1993 (Pl.'s 12(N)(3)(b) Stmt. ¶ 88), and Defendant's promotion of Matthew Murawski from a Salary Grade 5 position as a Micro Sort Operator Trainee to a Salary Grade 6 Senior Micro Sort Operator on September 1, 1993. (*id.* ¶ 89.)

To avoid a timeliness bar to his demotion claim and his claims concerning the four earlier acts of non-promotion, Plaintiff argues that "his claims for these actions are nevertheless timely under a continuing violation theory since they are part of an ongoing pattern of closely related discriminatory conduct which continued well into the limitations period." (Pl.'s Opp.Mem. at 15.) It is true that under the continuing violation doctrine, a plaintiff may satisfy Title VII's 300-day limitations period by linking one or more time-barred acts to a discriminatory act that occurred within the limitations period. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir.1997); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992). But aside from making the bare assertion quoted above, Plaintiff has presented no arguments to this court that Defendant's alleged violations should be characterized as continuous. Accordingly, his continuing violation argument cannot prevail. *Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir.1996) (observing by implication that a "bare allegation" that two discriminatory acts are continuous does not suffice to show a continuing violation); *Patterson v. General Motors Corp.*, 631 F.2d 476, 484 (7th Cir.1980) (noting that a "conclusory statement" that the acts complained of are continuous "is not sufficient to show a continuing violation"); *Saldana v. City of Chicago*, 972 F.Supp. 453, 456 (N.D.Ill.1997) (concluding that a plaintiff who intends to rely on the continuing violation doctrine must plead facts in support of the doctrine's application). In any event, Plaintiff would have difficulty relying on the continuing violation doctrine in this case.

The Seventh Circuit has identified three separate situations in which that doctrine could apply. The first situation arises from cases, usually involving the employer's hiring or promotion practices, "where the employer's decision-making process takes place over

a period of time, making it difficult to pinpoint the exact day the 'violation' occurred." *Stewart v. CPC International,* 679 F.2d 117, 120 (7th Cir.1982). In these cases, the limitations period begins to run when the plaintiff learns, or should have learned, that the employer has made a decision. *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994). This situation is inapplicable to the present case, however, because there is no basis for concluding that Plaintiff was unaware of the time-barred acts at issue as they were committed. The second situation stems from cases where the employer has an express, openly espoused policy of personnel management that the plaintiff has alleged to be discriminatory. *Selan,* 969 F.2d at 565. Plaintiff has not alleged that Defendant has an open policy of discriminating against employees who have filed charges against it, so this situation is also inapplicable here.

▮ Finally, the third situation arises when "the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy.... In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts." *Stewart,* 679 F.2d at 121. A plaintiff seeking to invoke this continuing violation theory must produce sufficient evidence to establish that "the defendant's acts were 'related closely enough to constitute a continuing violation[.]' " *Selan,* 969 F.2d at 565 (quoting *Berry v. Bd. of Supervisors of L.S.U.,* 715 F.2d 971, 981 (5th Cir.1983)). To determine whether the plaintiff has done so, courts in this circuit are required to consider three factors. First, they must evaluate "subject matter"; that is, whether the acts alleged to be discriminatory are similar and involve the same type of discrimination. *Id.* at 565 (citing *Berry,* 715 F.2d at 981). Second, courts must determine how frequently the defendant subjected the

plaintiff to the challenged behavior. *Id.* (citing *Berry,* 715 F.2d at 981). The more frequent the conduct, of course, the more likely it is that a court will find it continuous. Finally, and perhaps most importantly, courts must evaluate the "degree of permanence" of the acts the plaintiff seeks to string together. *Id.* (citing *Berry,* 715 F.2d at 981). Generally speaking, a continuing violation will be found under this factor if "it would have been unreasonable to require the plaintiff to sue separately on each one" or, put another way, if "the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment." *Malhotra v. Cotter & Co.,* 885 F.2d 1305 (7th Cir.1989). Conversely, a continuing violation will *not* be found under this factor "if the plaintiff knew, or 'with the exercise of reasonable care would have known after each act that it was discriminatory and had harmed her[.]' " *Jones,* 42 F.3d at 1058.

To preserve his otherwise time-barred failure to promote claims under this theory,[24] Plaintiff might argue that he had no reason to believe he was a victim of discrimination until a pattern emerged, one that continued into the relevant time frame with the promotions of Barbara Frazier and Matthew Murawski. But that argument is expressly foreclosed by the Seventh Circuit's decision in *Jones.* In *Jones,* Evelyn Jones, an African–American female, brought a race discrimination suit against her employer for the latter's alleged failure to promote her. Like Nair, her claim was based on not one but several alleged acts of non-promotion that occurred throughout her employment with the defendant. The district court held that all of the acts of non-promotion except one were time-barred. Jones appealed, arguing that the untimely acts of non-promotion were part of a continuing violation that culminated in the timely act of non-promotion. The

---

24. According to his response to Defendant's summary judgment motion, Plaintiff is challenging Defendant's failure to promote him only during the period after he transferred to the night shift in September 1992. (Pl.'s Opp.Mem. at 8.) The "acts" of the Defendant that support his claim, accordingly, are the promotions of Audrey Mitchell, Maria Angel, Leonirilda Mendoza, Karen

Consenza, Barbara Frazier, and Matthew Murawski to various positions that Plaintiff claims to have been interested in. As indicated above, only the promotions of Barbara Frazier and Matthew Murawski fall within the limitations period, so what we are discussing here is Plaintiff's (theoretical) attempt to link the time-barred acts of promotion with the two timely ones.

Seventh Circuit rejected her argument, holding that Jones knew, or should have known, that each act of non-promotion was discriminatory and had harmed her. *Jones*, 42 F.3d at 1058. It gave two reasons for this conclusion. First, Jones had admitted in her affidavit that she believed each act of non-promotion was discriminatory as it occurred. *Id.* Second, the court observed that "each promotion was a discrete decision and each time Jones knew, or should have known, that she had not received the promotion and someone else had." *Id.*

In this case, the evidence suggests that Plaintiff knew (or at least suspected) that each of the time-barred acts of non-promotion "was discriminatory and had harmed [him]." *Jones*, 42 F.3d at 1058. Moreover, as in *Jones*, each promotion was a "discrete decision" of which Plaintiff was, or should have been, aware. Accordingly, it would not have been unreasonable to expect Plaintiff to sue separately on each act of non-promotion. In sum, the continuing violation doctrine does not rescue Plaintiff's time-barred claims.

**b. Plaintiff's Remaining Title VII Retaliation Claims: Retaliatory Discharge, Retaliatory Harassment, and Two Acts of Retaliatory Failure to Promote**

 A plaintiff who brings a retaliation claim under Title VII must either present direct evidence of retaliation or proceed within the familiar burden-shifting framework set forth in *McDonnell. Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 482–83 (7th Cir.1996). Under the burden-shifting framework, Plaintiff can establish a prima facie case of retaliation by showing, first, that he engaged in statutorily protected expression or activity—that is, that he "opposed" an employment practice made unlawful by Title VII. *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir.1994); 42 U.S.C. § 2000e–3(a). To constitute opposition, the conduct an employee objects to need not actually violate Title VII. *Dey v. Colt*

*Const. & Development Co.*, 28 F.3d 1446, 1458 (7th Cir.1994). Rather, the test is whether the employee "reasonably believed in good faith that the practice she opposed violated Title VII." *Alexander*, 40 F.3d at 195. Second, the plaintiff must demonstrate that she suffered an adverse action by her employer. *Knox*, 93 F.3d at 1333. Any action qualifies, so long as it is in some way adverse. *Id.* at 1334 (observing that "There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint"). Finally, the plaintiff must establish a causal link between the protected activity or expression and the adverse action. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 938–39 (7th Cir.1996). Such a link may be established by evidence of "a telling temporal sequence," *Holland*, 883 F.2d at 1315, or by demonstrating that the adverse action "took place on the heels of the protected activity." *Alexander*, 40 F.3d at 196.

A successful prima facie case creates a rebuttable presumption of retaliation, *cf. Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011 (7th Cir.1996), and shifts to the defendant a burden of articulating a legitimate, non-retaliatory reason for the challenged conduct. *Knox*, 93 F.3d at 1334. If the defendant does so, the presumption of retaliation dissolves, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511–20, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and the plaintiff must then establish that the employer's proffered reason is a pretext for discrimination. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir.1997).

In this case, Plaintiff has three remaining retaliation claims: retaliatory failure to promote (two acts), retaliatory discharge, and retaliatory harassment. To shift the burden of production with respect to any of these three claims, Plaintiff must first make out a prima facie case. Defendant concedes that Plaintiff meets the first prong of the prima facie case by presenting evidence that he filed formal discrimination charges with state and federal agencies in 1986 and 1988.[25] The

---

**25.** Plaintiff also argues that the letter to Tom

Theobold, the Bank's chairman, constitutes op-

court will, therefore, proceed to a discussion of the remaining elements of a claim of retaliation.

### i. Retaliatory Failure to Promote

 Failure to promote qualifies as an adverse employment action. Moreover, Plaintiff has sufficiently demonstrated a causal link between the filing of charges and Defendant's failure to promote him after he transferred to the night shift in September 1992. True, the various acts of non-promotion did not begin until 1992, four years after Plaintiff had filed his latest charge of discrimination with the EEOC. But it is also true that Scornavacco did not serve as Plaintiff's supervisor until he transferred to the night shift, and she made all of the promotional decisions challenged by Plaintiff. (Scornavacco Dep. At 33–34 (Mitchell); 73–75 (Mendoza); 81 (Cosenza); 75–76 (Frazier); 78–79 (Murawski).) Given Scornavacco's admitted knowledge of the charges and the immediacy with which the failure to promote commenced after Plaintiff transferred to the night shift,[26] Plaintiff has in this court's view met his burden of establishing causation.

Note that, as discussed above, Defendant is deemed to have admitted that Plaintiff was "fully qualified" for the positions filled by Frazier and Murawski. Defendant has offered no evidence that either Frazier or Murawski was more qualified than Plaintiff. Defendant does assert that "the senior micro sort operator [the Salary Grade 6 position to which Murawski and Frazier were both elevated] is a deadline-oriented job and Plaintiff had not been successful when he was working on a deadline." (Def.'s Reply at 8 (citing Scornavacco Dep. at 79).) Apart from Scornavacco's bare assertion that Plaintiff "wasn't successful in what he was doing in working on deadlines," however, Defendant has provided no support for this argument—no description of the duties involved in the "deadline-oriented jobs," no information concerning Murawski's or Frazier's background or abilities, nor any specifics concerning Nair's problems with meeting deadlines. On a motion for summary judgment, this court must resolve any doubts concerning these issues in Plaintiff's favor. Accordingly, with respect to these two failure to promote claims, Defendant's motion for summary judgment is denied.

### ii. Retaliatory Harassment

██ Plaintiff has satisfied the remaining two prongs of the prima facie case for retaliatory harassment. With respect to the adverse action requirement, Plaintiff asserts his night shift supervisor Kenneth Stell: (1) took voluminous notes on him (Nair Aff. ¶ 21; Pl.'s 12(N)(3)(b) Stmt. ¶ 78); (2) refused to talk to him, but conversed freely with other employees (Nair Dep. at 144, 277–78; Pl.'s 12(N)(3)(b) Stmt. ¶ 77); and (3) excluded him from at least seven or eight section meetings.[27] (Nair Dep. at 142–44; Pl.'s 12(N)(3)(b) Stmt. ¶ 76.) Plaintiff has also presented evidence of causation. It is uncontroverted that Stell knew Plaintiff had previously filed discrimination charges against Defendant (Stell I Dep. at 17–18; Nair Dep. 127–29) and even told Nair "I know all about you"; that the alleged acts of harassment were committed by Stell (id.); and that the alleged harassment began almost immediately upon Plaintiff's transfer to the night shift in September 1992. (Nair Dep. 276–77.)

position to an employment practice made unlawful by Title VII. But even assuming the letter objects to unlawful conduct—a dubious proposition considering that the letter makes no reference either to race discrimination or retaliation—Plaintiff has presented no evidence that Stell, Scornavacco, or Canning knew about its existence.

26. Plaintiff transferred to the night shift in September 1992, and was immediately passed over for promotion the following month in favor of Maria Angel. (Pl.'s 12(N)(3)(b) Sum. ¶ 66.) Although that act of non-promotion is not procedurally viable—like most of the acts of non-promotion challenged by Plaintiff—it is nevertheless relevant evidence of a pattern of conduct that culminated in the acts of non-promotion that are viable, the promotions of Barbara Frazier and Matthew Murawski.

27. Plaintiff also claims that Stell refused to allow him to modify his work schedule but freely allowed other employees to modify theirs. (Nair Aff. ¶ 17.) He has not put forth evidence, however, that Stell in fact allowed other employees to change their work schedules. Accordingly, this court dismisses Plaintiff's harassment claim to the extent it relies on the allegation that Stell refused allow Plaintiff to change his hours.

With respect to his claim that Stell took voluminous notes on him, Plaintiff has provided copies of numerous pages of notes Stell took on him between December 4, 1992 and January 5, 1994. (Stell Notes, Ex. 13 to Stell Dep.) In contrast, Defendant has offered no copies of notes it claims Stell took on other employees. Similarly, Defendant has failed to provide evidentiary support for its assertion that the "busy working environment" prevented Stell from speaking more frequently with Plaintiff; and the court finds no references in the depositions of Stell, Scornavacco, or Canning to the working environment at the Bank. Accordingly, Plaintiff's retaliatory harassment claim survives to the extent it is based on the following acts of harassment: (1) Stell's failure to include Plaintiff in section meetings, (2) Stell's note-taking, and (3) Stell's failure to speak with Plaintiff more frequently during working hours.[28]

### iii. Retaliatory Discharge

There is no dispute that Plaintiff's termination constitutes an adverse employment action. *Alexander*, 40 F.3d at 196. It is at least arguable, moreover, that Plaintiff's termination was "caused" by his opposition to what he believed to be unlawful discrimination at the Bank. Indeed, although six years elapsed between the time Plaintiff filed his most recent charge of discrimination and his termination, Plaintiff has presented uncontroverted evidence that Stell and Scornavacco knew about his prior charges of discrimination, that he suffered adverse treatment at the hands of Stell and Scornavacco immediately after he transferred to the night shift, and that Stell and Scornavacco eventually recommended his termination to Human Resources Vice President Agnes Canning. What Plaintiff has not done, however, is establish that Defendant's stated reason for his termination, absenteeism, is a pretext for retaliation. The court will more thoroughly explain the basis for this conclusion in connection with Plaintiff's § 1981 claim, because the parties appear to focus on the pretext inquiry primarily, if not exclusively, as it relates to that claim.[29]

### c. Count II of Plaintiff's Amended Complaint: The § 1981 Claims

In Count II of his Amended Complaint, filed on November 22, 1996, plaintiff makes allegations similar to those in his original complaint but alleges a violation of 42 U.S.C. § 1981, not Title VII. Defendant argues that Plaintiff's § 1981 race discrimination claims are barred by the statute of limitations, because Plaintiff waited until more than two years after the latest alleged act of discrimination—his discharge—to file these claims. (Def.'s Mem.Supp.Mot.Sum.J. at 15–16.) Plaintiff concedes that he filed the § 1981 claims outside of the two-year statutory period, but argues that the race discrimination claims are nonetheless timely because they "relate back" to his timely filed Title VII race and national origin discrimination claims. (Pl.'s Opp.Mem. at 14–15.) In a final riposte, Defendant responds that, notwithstanding the relation-back doctrine, Plaintiff's § 1981 race discrimination claims are time barred because "Plaintiff's race and national origin claims [under Title VII] are not properly before this Court." (Def.'s Reply at 4.) Accordingly, it concludes, "there is

**28.** The court is aware of the Seventh Circuit's admonition that "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996). Defendant has not, however, argued that the acts of harassment complained of fall short of the adverse action requirement. This court will not grant summary judgment on the strength of an argument the moving party itself has overlooked. *Edwards v. Honeywell*, 960 F.2d 673, 674 (7th Cir.1992).

**29.** Of course, what a plaintiff must prove to demonstrate pretext in a race discrimination case differs from what she must prove to demonstrate pretext in a retaliation case. To demonstrate pretext in a race discrimination case, a plaintiff must prove that similarly situated employees *outside of the plaintiff's protected class* were treated more favorably, whereas in a retaliation case she must prove that similarly situated employees *who had not filed charges or otherwise opposed unlawful discrimination* were treated more favorably. Nevertheless, because the court concludes in its discussion of Plaintiff's § 1981 race discrimination claim that no employee was treated more favorably than Plaintiff, this distinction—at least for purposes of transposing the court's pretext analysis to Plaintiff's retaliation claim—is immaterial.

nothing for the Section 1981 claims to relate back to[.]" (*Id.*) This court considers these arguments below.

The limitations period applicable to § 1981 claims brought in a federal court sitting in Illinois is two years, *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1326–28 (7th Cir.1989), unless the § 1981 claims "relate back" to any claims included in an earlier filed, timely complaint. Under the relation-back doctrine, an amended complaint will be deemed to have been filed on the date of the original complaint if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R.CIV.P. 15(c)(2). What this means is relatively straightforward: For the doctrine to apply, the new claim asserted in the amended complaint must arise out of the same core facts as the claims included in the original pleading. *Bularz v. Prudential Ins. Co. of America*, 93 F.3d 372, 379 (7th Cir.1996). Significantly, therefore, the doctrine rescues untimely claims that arise from the same set of facts but that assert new theories of recovery. *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 410 (7th Cir.1989), *aff'd on other grounds*, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990).

The Seventh Circuit has not decided whether a plaintiff can use the relation back doctrine to tack untimely § 1981 claims to procedurally defective Title VII claims, the issue raised by the Defendant in this case. But at least one other circuit has, and has answered the question in the affirmative. In *Goss v. Revlon, Inc.*, 548 F.2d 405 (2d Cir. 1976), the Second Circuit held that the plaintiff's untimely § 1981 claims related back to the Title VII claims in his original complaint, even though the Title VII claims were themselves untimely: The plaintiff had failed to file discrimination charges with the EEOC within the 180–day limitations period provided for by statute. *Id.* at 406. The court

began by observing that § 1981, "although parallel to Title VII and directed in part at the same illegal practices," was not preempted by Title VII when that statute was passed as part of the Civil Rights Act of 1964. *Id.* at 407 (citing *Alexander*, 415 U.S. at 47–49). Accordingly, the court continued, the failure of a claimant to properly pursue her administrative remedies before the EEOC—an agency that plays no role in the handling of § 1981 violations—does not preclude her from bringing a parallel claim under § 1981. *Goss*, 548 F.2d at 407. Incorporating the relation-back doctrine into this general rule, the court logically concluded that nothing prevents a claimant from tacking an untimely § 1981 claim to a procedurally defective Title VII claim, so long as the § 1981 claim arises out of the same "transaction or occurrence" set forth in the original complaint.[30] *Id.* (quoting FED.R.CIV.P. 15(c)).

The facts in this case are analogous to the facts in *Goss*. As in *Goss*, the Plaintiff in this case is attempting to assert an otherwise untimely § 1981 race discrimination claim by relating it to a procedurally defective Title VII claim.[31] Because *Goss* unequivocally holds that Plaintiff may do so, this court concludes that the § 1981 claims in Plaintiff's amended complaint relate back to October 25, 1995, the date his original complaint was filed.

Even so, the acts of the Defendant that gave rise to Plaintiff's demotion, failure to promote, and harassment claims all occurred more than two years before Plaintiff filed his original complaint. His transfer to the night shift, the sole act on which he relies for his demotion claim, occurred in September 1992. Moreover, Defendant's latest act of non-promotion (the promotion of Matthew Murawski in Plaintiff's stead) occurred in September 1993. Finally, it is unlikely that any of Stell's alleged acts of harassment occurred after October 25, 1993. It is undisputed that Plaintiff was absent for most of

---

**30.** Another circuit's case law indicates that the converse is also true. In *Watkins v. Lujan*, 922 F.2d 261, 265 (5th Cir.1991), the Fifth Circuit held that an untimely Title VII claim can relate back to a § 1981 claim for which the court lacked subject matter jurisdiction.

**31.** Earlier in this opinion, Plaintiff's Title VII race and national origin claims were found to be procedurally defective because they exceeded the scope of his underlying EEOC charge.

the period between October 25, 1993 and February 14, 1994, the day he was terminated. Plaintiff himself attributes these absences to Stell's alleged harassment, so it is only logical to conclude that any harassment suffered by Plaintiff occurred prior to October 25, 1993. Thus, only Plaintiff's termination, which occurred on February 14, 1994, falls within the two-year limitations period applicable to § 1981 suits. Accordingly, Plaintiff's demotion and failure to promote claims under § 1981 are untimely.[32] This court now turns to the merits of Plaintiff's contention that Defendant discharged him on account of his race.

Stated broadly, § 1981 "addresses racial discrimination in contractual relationships." *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996). It applies to all entities, public or private, and, as amended by the Civil Rights Act of 1991, targets race discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Litigants have invoked § 1981 most frequently to vindicate rights arising from the contract of employment. *Morris*, 89 F.3d at 413. In this respect, suits under § 1981 and Title VII often overlap, even though " § 1981 and Title VII differ in the types of discrimination they proscribe[.]" *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir.1996). Accordingly, in light of the fact that litigants commonly invoke both statutes interchangeably in employment discrimination suits, the Seventh Circuit has held the *McDonnell Douglas* burden-shifting scheme applicable to discrimination suits under § 1981. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986).

A plaintiff seeking to prove discriminatory discharge has two routes available to him. First, she can put forth direct or, more commonly, circumstantial evidence of discrimination. In this case, Plaintiff argues that Stell's "damn Indian" comment, together with the fact that "Stell was responsible for recommending Nair's discharge [to Agnes Canning, the person who terminated Plaintiff] and the remark was made during the course of a conversation in which Stell stated that he intended to discharge Nair," constitute circumstantial evidence of discriminatory discharge. But even apart from the difficulty of imputing Stell's racist sentiment to Agnes Canning—a leap that must be taken if we are to believe Plaintiff's account—the statement was too remote in time from Plaintiff's discharge to be of much probative value. *See, e.g. Hill v. Burrell Comm. Group, Inc.*, 67 F.3d 665, 669 (7th Cir.1995) (noting by implication that circumstantially relevant oral statements must be made close in time to the plaintiff's termination to have probative value), *overruled in part on other grounds by O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Knox v. First Nat. Bank*, 909 F.Supp. 569, 574 (N.D.Ill.1995) (observing both that "some nexus must exist between an alleged racial remark and the employment decision at issue under both the direct and indirect methods of proof before the remark can give rise to an inference of discriminatory intent" and that a remark of the decision maker may be so remote in time in time as to have *de minimis* probative value). By Plaintiff's own admission, Stell made the remark only "a few months" after he transferred to the night shift in September 1992 (Pl.'s 12(N)(3)(b) Stmt. ¶ 74), but he was not terminated until February 1994.

The second way a plaintiff can establish discriminatory discharge—and the way on which Plaintiff has concentrated his efforts in this case—is through the indirect, burden-shifting method of proof already discussed in connection with Plaintiff's Title VII retaliation claims. But because in this court's view Plaintiff has failed to establish that Defendant's stated reason for terminating him, absenteeism, is pretextual, it need not decide whether Plaintiff has made out a prima facie case for discriminatory discharge.[33] *Holmberg v. Baxter Healthcare*

---

32. As noted above, the continuing violation doctrine does not apply to any of these claims.

33. To make out a prima facie case for discriminatory discharge under either Title VII or § 1981, a plaintiff must prove that (1) he is a member of a protected class; (2) he performed

*Corporation,* 901 F.2d 1387, 1391 (7th Cir. 1990) ("Where the plaintiff has not met [his] burden of showing that [his employer's] explanations are merely a pretext for discrimination, it is not necessary to decide whether he has also established a prima facie case."). Instead, it will proceed directly to an analysis of the pretext issue.

■ Pretext has been defined by the Seventh Circuit as a "phony reason for some action," *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995), and may be established by either of two methods. First, a plaintiff can demonstrate pretext by "presenting direct evidence that a discriminatory reason motivated the employer's decision[.]" *Essex v. United Parcel Service,* 111 F.3d 1304, 1310 (7th Cir.1997). Alternatively, where (as here) such evidence is lacking, a plaintiff can establish pretext by "presenting evidence that the employer's proffered reason is unworthy of credence, thus raising the inference that the real reason is discriminatory." *Id.* Particularly relevant to this latter method of proving pretext is evidence that the employer treated similarly situated employees outside of the plaintiff's protected class more favorably than she did the plaintiff. *Id.* at 1311. The "similarly situated" qualification is an important one, and the Seventh Circuit has interpreted it strictly. *See, e.g. Wallace,* 103 F.3d at 1398 (explaining that an American employee terminated by a Japanese company for botching a project had to demonstrate not just that the company did not fire a Japanese employee, but that the company did not fire a Japanese employee who had also botched a project).

■ Whatever method plaintiff chooses to establish pretext, the question is always whether the employer honestly believed its proffered reason for the discharge. *Kralman v. Illinois Dept. Of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994). Proof that the employer discharged the plaintiff mistakenly or based its decision on bad policy, or even just plain stupidity, "goes nowhere as evidence that the proffered explanation is pretextual." *Essex,* 111 F.3d at 1310. Accord-

ingly, to survive summary judgment, the plaintiff must advance facts from which a reasonable jury could infer that she was fired for discriminatory reasons. *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 348 (7th Cir.1997).

■ Defendant urges that Plaintiff's chronic attendance problem justified his discharge. In support of his contention that this articulated reason for terminating him was a cover-up for race discrimination, Plaintiff makes two "indirect proof" arguments. First, he argues that two non-Indians with similar attendance records, Olivia Haley and Lionel Uribe, were not discharged. (Pl.'s Opp.Mem. at 12.) With respect to Olivia Haley, Defendant concedes it did not terminate her but argues that she was not similarly situated to Plaintiff because she was away from work pursuant to the terms of Defendant's long term disability policy. (Def.'s Mem.Supp.Mot.Summ.J. at 11; Haley Disability Document, Ex. 36 to Def.'s 12(M) Stmt.) Plaintiff neither contests that Haley's absences were justified under Defendant's disability policy nor argues that he was eligible for such benefits. (Pl.'s 12(N) Stmt. ¶¶ 54, 55.) Accordingly, this court concludes that Defendant's retention of Haley is irrelevant to Plaintiff's claim of disparate treatment because she was not similarly situated to him.

With respect to Lionel Uribe, Defendant argues that he would have been terminated for excessive absenteeism had he not chosen to resign on his own. Plaintiff asserts that this argument is "pure speculation" on Defendant's part (Pl.'s 12(N) Stmt. ¶ 52), but he notes in his statement of material facts that Defendant issued Uribe a "final warning" on April 13, 1994. (Pl.'s 12(N)(3)(b) Stmt. ¶ 105.) The court notes that Uribe did not resign until September 22, 1994, and that Defendant has not offered facts to demonstrate that Uribe resigned during the absence period immediately to follow the issuance of the final warning. (Def.'s 12(M) Stmt. ¶ 52.) Nevertheless, where the evidence of Plaintiff's chronic absenteeism is

his job satisfactorily; (3) despite his performance, he was discharged; and (4) other similarly situated employees outside of his protected

class were treated more favorably. *Oates v. Discovery Zone,* 116 F.3d 1161, 1171–72 (7th Cir. 1997).

weighty, Plaintiff bears a heavy burden to establish that Defendant would have retained Uribe despite his poor attendance record, and pointing to evidence that is at best ambiguous on this point is not enough to get past summary judgment. *Essex,* 111 F.3d at 1311 ("Plaintiffs cannot create issues of fact by pointing to the ambiguity of their own evidence.").

Perhaps more importantly, any probative value the Uribe situation has in proving pretext is outweighed by the fact that Defendant terminated two non-Indian employees in 1993 and 1994 for excessive absenteeism.[34] Plaintiff does not dispute that Defendant terminated non-Indian employees Craig Williams and Derrick Staggs for excessive absenteeism around the time that he was terminated. (Def.'s 12(M) Stmt. ¶¶ 49, 50, 51; Pl.'s 12(N) Stmt. ¶¶ 49, 50, 51.) In this court's view, a reasonable jury could not logically infer from the sum of these actions that the real reason for Plaintiff's discharge was discriminatory.

Plaintiff's second argument in support of his contention that the stated reason for his discharge is pretextual is that Defendant "failed to adhere to its own attendance policy and did not issue the requisite number of warning memos to Nair before terminating his employment." (Pl.'s Opp.Mem. at 12.) According to Plaintiff, Defendant's policy authorizes dismissal only when an employee accrues six absence occurrences in a 12–month period, and then only if the employee has received four warning memoranda under the *"progressive"* warning system set forth in the policy. (Pl.'s Opp.Mem. at 12; Pl.'s 12(N) Stmt. ¶ 49). Evidence of pretext, he contends, arises from three "facts." First, Plaintiff claims to have accrued four absence occurrences and two warning memoranda in the 12–month period prior to his termination.[35] (Pl.'s 12(N)(3)(b) Stmt. ¶ 94.) Sec-

ond, Defendant impermissibly based its decision to terminate Plaintiff on his long history of absenteeism instead of confining its evaluation to the 12–month period immediately preceding Plaintiff's termination. (Pl.'s Opp. Mem. at 12; Canning Dep. at 49.) Finally, Plaintiff asserts (without citation to the record) that non-Indian employees terminated for excessive absenteeism in 1993 "receiv[ed] the appropriate number of warnings" and were terminated solely based upon their attendance records in the 12 months period to their discharge. (*Id.* at 12–13.)

 Although it is true, as Plaintiff points out, that an employer's failure to follow its own procedures is relevant to a showing of pretext, *Futrell v. J.I. Case,* 38 F.3d 342, 349 (7th Cir.1994), it is also true that an employee's subjective interpretation of what those procedures are cannot create a genuine issue of fact on the issue of pretext. *Cf. Aungst v. Westinghouse Elec. Corp.,* 937 F.2d 1216, 1221 (7th Cir.1991) (observing that the plaintiff's "self-serving testimony" that he was fired for reasons other than those stated by his employer amounts to no evidence at all), *overruled in part on other grounds by Oxman v. WLS–TV,* 12 F.3d 652 (7th Cir.1993). In this case, Plaintiff has simply failed to demonstrate that Defendant deviated from its attendance policy in terminating him. First, Plaintiff has failed to establish that the policy's literal language permits termination only after an employee has received four warning memoranda and accrued six absences in a 12–month period. This is hardly surprising; the language of the policy unambiguously provides that the progressive "six absence, four warning" flagging system is a guideline, not a hard and fast rule, for determining whether termination is appropriate. (Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.) Moreover, no-

---

**34.** Defendant actually claims that a third non-Indian employee, Karen Cosenza, was terminated around the time of Plaintiff's discharge. But as Plaintiff correctly points out, Defendant has failed to provide the requisite evidentiary foundation for the documents that detail the circumstances of her termination (Pl.'s 12(N) Stmt. ¶ 51), and so they are inadmissible.

**35.** As indicated in this court's statement of facts, Defendant does not dispute that Plaintiff had

accrued something less than six absence occurrences and four warning memoranda in the 12–month period prior to his termination. It does question Plaintiff's account of the specifics, but that dispute is immaterial to this court's determination, in the first instance, of whether Defendant's attendance policy permitted it to terminate employees who had accrued fewer than six absence occurrences and four warning memoranda.

where does the policy prohibit supervisors from taking an employee's attendance history into account in deciding whether to take disciplinary action. Rather, the policy provides that "Possible termination will be reviewed in light of the individual circumstances and attendance patterns demonstrated by the employee." (*Id.*) Second, Plaintiff has not shown that the circumstances surrounding the terminations of similarly situated employees necessarily warrants a finding that Defendant's attendance policy is as inflexible as he says it is. Admittedly, the record suggests one non-Indian employee, Craig Williams, was allowed six absences and four warning memoranda prior to being terminated. At the other extreme, however, is the case of Derrick Staggs, a non-Indian employee who accrued two and a half absence occurrences in his first month on the job and was promptly terminated.[36] (Def.'s 12(M) Stmt. ¶ 50; Pl.'s 12(N) Stmt. ¶ 50.) At best, Plaintiff has shown that Defendant's attendance policy requires subjective judgment and is susceptible to arbitrary application, but that alone is not enough to raise a genuine issue of discrimination. *Senner v. Northcentral Technical College,* 113 F.3d 750, 756–57 (7th Cir.1997). Accordingly, Plaintiff cannot prevail in his claim that Defendant's stated reason for his termination, absenteeism, is a pretext for race discrimination.

Finally, this court notes that Defendant has done more than merely poke holes in Plaintiff's pretext arguments—it has affirmatively put forth evidence to bolster its claim that poor attendance, and not racism, led to Plaintiff's discharge. As recited in this court's statement of facts, Defendant has demonstrated that Plaintiff had problems showing up for work from the beginning of his employment relationship with Defendant. In 1982, one of Plaintiff's supervisors noted that he was "absent and late more often than normal. Often away from his desk without good reason." (September 1982 Performance Appraisal, Ex. 22 to Def.'s 12(M) Stmt.) It is undisputed that Defendant issued Plaintiff a total of seven warning memoranda for poor attendance between 1984 and 1991. (Nair Dep. at 98; 1984–91 Disciplinary Memoranda, Ex. 23 to Def.'s 12(M) Stmt.) Each of these memoranda stated that "an immediate and lasting improvement" in Plaintiff's attendance was expected, and that failure to improve could impact his future performance appraisals, merit increases, and tenure with the Bank. (1984–91 Disciplinary Memoranda, Ex. 23 to Def.'s 12(M) Stmt.) Plaintiff's July 1991 performance appraisal warned Plaintiff that he "must be cautious with his attendance record so that it does not become a factor in his performance." (July 1991 Performance Appraisal, Ex. 24 to Def.'s 12(M) Stmt.) Plaintiff was again specifically warned in August 1993, after a series of three prolonged absences, that "unless an immediate and lasting improvement is made in [Plaintiff's] attendance record, it will affect his future promotions, salary reviews and *could lead to his termination.*" (8/13/93 Memorandum, Ex. 26 to Def.'s 12(M) Stmt.) (emphasis supplied). Still undeterred, Plaintiff embarked in November 1993 on yet another absence period and upon his return to work in mid-December received what would ultimately be his final warning before Defendant terminated him. (12/15/93 Memorandum, Ex. 23 to Def.'s 12(M) Stmt.) To impress upon Plaintiff the seriousness of his attend-

---

36. Plaintiff argues that Staggs's termination occurred on the heels of a "change" in Defendant's attendance policy that postdated Plaintiff's discharge, and therefore that Staggs is not similarly situated to him. (Pl.'s Opp.Mem. at 13.) Plaintiff has not, however, pointed to any language in the revised policy to support his conclusion that the new policy gives supervisors more latitude than the original policy in disciplining employees for poor attendance. (Attendance Incentive Program, Dated 12/15/93, Ex. 10 to Stell Dep.) Presumably he is referring to language that provides "we will also be looking at patterns of attendance over time" (*id.*), but that language appears to this court to be no less restrictive than the language of the earlier policy, which provides "Possible termination will be reviewed in light of the individual circumstances and attendance patterns demonstrated by the employee." (Attendance Policy, Ex. 21 to Def.'s 12(M) Stmt.) If Plaintiff is suggesting that Staggs had more incentive to attend work than he did because the new guidelines were part of a broader (and new) attendance incentive program, his argument is, in the vernacular, a "non-starter." The key to the pretext inquiry is the employer's motivation, not the employee's. *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir. 1992).

ance problem, moreover, this memorandum tracked Plaintiff's abysmal attendance record since 1988. (*Id.*) Less than two weeks later, on December 23, 1993, Plaintiff began a final absence period, and was terminated when he returned to work on February 14, 1994. (Canning Dep. at 101.)

This court concludes that no reasonable jury could infer from these facts that Defendant's stated reason for terminating Plaintiff, absenteeism, is a pretext for race discrimination. The record shows, instead, that Defendant waited many months to take disciplinary action on an employee whose attendance record was nothing short of abysmal. This record does not demonstrate discriminatory animus.

### CONCLUSION

Plaintiff's Title VII claims of race discrimination and national origin discrimination are dismissed due to his failure to assert these claims in his underlying EEOC charge. He may, however, pursue his claims that the Bank retaliated against him for having filed previous charges of discrimination. His claims of harassment by his supervisor and retaliatory failure to promote him in August and September 1993 are timely and survive summary judgment. Because there is no genuine dispute that absenteeism was the reason for the discharge, however, he has not created a dispute of material fact as to whether his discharge was retaliatory. For similar reasons, his § 1981 race discrimination claim also fails. The court denies Defendant's motion for summary judgment with respect to Plaintiff's retaliation claims of harassment and failure to promote. In all other respects, Defendant's motion is granted.